## Phillips's Estate.

Argued January 28, 1930. Before MOSCHZISKER, C. J.,
FRAZER, WALLING, SIMPSON, SADLER and SCHAFFER, JJ.

*A. A. Vosburg*, with him *Thomas A. Donahoe, L. E. Renard, John J. Owens* and *A. Floyd Vosburg,* for appellants, cited: Novicki v. O'Mara, 280 Pa. 411; Pidcock v. Potter, 68 Pa. 342; Yardley v. Cuthbertson, 108 Pa. 395; McCormick v. McCormick, 194 Pa. 107; Phillips's Est., 244 Pa. 35; Guarantee Trust Co. v. Waller, 240 Pa. 575; DeHaven's App., 75 Pa. 337; Herster v. Herster, 116 Pa. 412; Miller's Est., 179 Pa. 645; Robin-

son v. Robinson, 203 Pa. 400; White's Est., 33 Pa. Superior Ct. 533; Gearhart's Est., 39 Pa. C. C. R. 701; Timmes's Est., 237 Pa. 189.

*T. L. Hoban* and *John P. Kelly*, with them *W. J. Fitzgerald, C. P. O'Malley* and *H. A. Knapp*, for appellees, cited: Wilson v. Mitchell, 101 Pa. 495; Heister v. Lynch, 1 Yeates 108; McMaster v. Blair, 29 Pa. 298; Reichenbach v. Ruddach, 127 Pa. 564; Shreiner v. Shreiner, 178 Pa. 57; Snyder's Est., 279 Pa. 63; Lawrence's Est., 286 Pa. 58; Wertheimer's Est., 286 Pa. 155.

OPINION BY MR. JUSTICE SIMPSON, March 17, 1930:

This is an appeal from the refusal of the court below to award an issue devisavit vel non. The petition prayed that it be granted on two grounds: (1) To determine whether or not decedent had testamentary capacity; and (2) Whether or not the writing produced "is the last will and testament of Mary Phillips, deceased." The latter involves a mixed question of law and fact, and cannot properly be made the subject of an issue devisavit vel non: Bitner v. Bitner, 65 Pa. 347; Lappe's Est., 215 Pa. 424, 427. It was, therefore, wisely excluded from consideration in the court below, as it will be here.

On a prior appeal (Phillips's Est., 295 Pa. 349) we did not pass on the merits of the controversy, but reversed the court below for mistakenly excluding the testimony of three of decedent's attending physicians, because it was believed that the Act of June 7, 1907, P. L. 462, rendered them incompetent. On the return of the record, a little additional testimony was taken, and then the trial judge again dismissed the petition for an issue, because on "a careful review of all the evidence in the case [he was] unable to find facts which, if disclosed on a trial, would justify [him] in sustaining a verdict against the will." We are likewise unable to find such facts.

While, in the nature of things, some latitude must be given in the production of evidence in this class of cases, the vital point of time is the date of the execution: Watmough's Est., 258 Pa. 22. If decedent knew and understood the business in which she was engaged at that time, evidence as to her state of mind at other times becomes of no importance: Thompson v. Kyner, 65 Pa. 368; Snyder's Est., 279 Pa. 63; Rubins v. Hamnett, 294 Pa. 295. The next most important thing is decedent's mental condition at the time she gave instructions for the drafting of her will, it being at a date prior to that of execution. Under such circumstances, the applicable rule of law is that where the scrivener and subscribing witnesses give clear and positive evidence of testamentary capacity, and no fraud or imposition is alleged, it will require strong evidence to the contrary to induce the court to award an issue (McNitt's Est., 229 Pa. 71; Morgan's Est., 219 Pa. 355), especially if, as here, the will being contested is similar to prior wills against the validity of which there is no substantial evidence: Long's Est., 237 Pa. 149.

In the present case, the scrivener of the will and one of the subscribing witnesses was Reese H. Harris, Esq., a highly respected member of the Lackawanna County Bar, who had been counsel for decedent for seven years. The other subscribing witness was a Miss Anna Buckley, who had known decedent for some three years. Probably as the result of a telephone communication, decedent called at Mr. Harris's office on May 22 or 23, 1925. She came alone. She told him she wanted to alter her will. He got the existing will from his safe, where it had been since its execution about a year before. He read it over to her paragraph by paragraph, and she told him what changes she desired to have made in it, and he made a memorandum of them. The principal one was to strike out the gift of a house to her sister, one of the contestants. This was done because they had gradually become estranged, probably largely due to the fact that

decedent did not like her sister's husband; and because
the sister's son, who had been in decedent's employ, had
forged her name to a number of checks and drawn the
money from bank, and his parents had made no offer to
make the loss good. When the changes had all been
noted, the date of May 26, 1925, was fixed for the execu-
tion of the new will. Promptly, at the day and hour
agreed on, decedent again called alone at Mr. Harris's
office; the new will was read over, item by item, each of
which was then approved by decedent; and when the
reading was concluded, decedent said, "Yes, that's just
the way I want it." Miss Buckley was then called in,
decedent acknowledged it as her will, it was signed by
her, and, at her request, witnessed by Mr. Harris and
Miss Buckley, and then placed in Mr. Harris's safe,
where it remained until after the death of decedent.

Mr. Harris's belief as to decedent's mental condition
at that time was gone into very fully, but it may be
summed up in the following questions and answers ap-
pearing in his testimony: "Q. Just how was she in re-
spect to her mental strength as you noticed her that
morning? A. Why, she appeared as she had always
appeared to me. She knew just what she wanted; she
knew what property she had; she knew who her rela-
tives were; she knew whom she wanted to give her prop-
erty to; she knew all that and she knew just the kind
of property she had, and she knew all those things just
as well as she did at any time that I had known her.
...... Q. What [is] your opinion [as to her condition]
that morning as to whether she fully comprehended in-
telligently and that she had a full grasp of her property
and of her relatives and all that sort of thing? A. She
certainly did. Q. You have no question and no doubt
in your mind about that at all, have you? A. Abso-
lutely no question whatever."

In order that the first of those answers may be fully
understood, it is necessary to know what had been Mr.
Harris's business dealings with decedent. She owned

five properties, which she leased, collected the rents herself, and attended to their repairs. Two of them were sold by her for satisfactory prices fixed by herself. In briefly setting forth what he did for decedent, Mr. Harris said: "Mrs. Phillips came into my office on an average of once a month at least I think, not at regular intervals, but it would average once a month and sometimes she would be in several times, and then perhaps I wouldn't see her for two or three months, depending upon her business affairs, during the seven years that she came to my office to see me. I looked after her various matters, the preparation of the leases for the houses she owned, and in any controversy she had with the tenants; she had two or three automobile adjustments; I helped her with tax matters in connection with her properties, and occasionally she talked with me about fire insurance. Each year I made up her income tax returns for her [she furnishing the needed data]; then there was one year early in 1921 she had some trouble over the forging business [by her sister's son] and of course I saw her frequently at that time; then she had as I say trouble with some tenants, including the Joneses, [her sister and the latter's husband]...... She knew absolutely what she was doing; she knew what she wanted, and she insisted on what she wanted;...... I would say, for her education, she was a woman of unusual mental keenness and ability." There was also some business, regarding her summer home, which was detailed to Mr. Harris on the day instructions were given for the will. This was later attended to by him. During all the time covered by these transactions and down to the time she executed the will, she was, he said, fully competent to and did intelligently attend to all her business matters. There was also evidence to the same effect by the officers of the bank where her account was kept, and who advised with her regarding her investments; by the fire insurance agent who attended to her insurance matters; by the tradesmen with whom she dealt; and she ran her house

with care and skill. It would unduly extend this opinion to enlarge on these matters.

As against all this there was the usual testimony of the failings of age, lapses of memory, irritability, fear of poverty and matters of kindred character, which ordinarily are of little importance (Morgan's Est., 219 Pa. 355), and here were of none. The witnesses for contestant did not detail any business neglect, but gave a number of proofs of business acumen, notably in the purchase of household supplies, and in the hire and discharge of those in her employ. Their testimony is of the weakest character and need not be detailed, especially as, in their brief and at bar, appellants' counsel planted their claim for a reversal almost entirely upon the testimony of three doctors, who, on occasions running through a period of thirty or forty years, had been decedent's attending physicians.

With one accord, they said decedent was not, in their opinion, competent to make a will, yet not one of them gave a legal reason for that conclusion. They gave no instance of a lack of business ability, which seemed to them, apparently, to be a matter of very little moment. Indeed, it would appear from a reading of their testimony, that because they thought decedent had paresis she must be incompetent, since, in their opinion, that was the medical conclusion regarding the disease, at least in its latest stage, and this though they admitted that people had carried on extensive businesses while so suffering. Two of them were not advised as to what the law meant by testamentary capacity and apparently did not know; but this did not affect their willingness to say decedent did not possess it. A brief extract from the testimony of one of them will well state their point of view: "Q. Do you know that she looked after her properties and collected her rents, and looked after the paying of her taxes, and that she looked after her income tax reports, and she went to the bank and made deposits in the bank, and that she drew checks against

her account in the bank, and in general she looked after all her affairs, do you know that? A. No. Q. And that she had a complete grasp of her business and all the things connected with her affairs, and do you know that that continued up to the day before she died? A. I don't know. Q. And that the day she died she went to the market and did the marketing for the house, do you know that? A. I do not...... Q. And if you knew and it appeared that she did all these things that I have mentioned,......would you say she was not competent to transact her business, if you knew all these facts? A. I would." The third doctor who said he had been decedent's family physician for over thirty years, continuing up to about nine months before her death, expressed the opinion that she lacked testamentary capacity, though he gave no instance of a lack of business ability in regard to anything, and blandly admitted that he knew she attended to her business and household affairs during all that time.

As to such testimony, we need only repeat what we said in Snyder's Est., 279 Pa. 63, 74-5: "Yet these physicians, despite their ignorance regarding decedent's actual transaction of business, and of the legal test as to capacity in this class of cases, especially where fraud and imposition are not alleged, one and all assert he was not competent to transact business, nor to make the will or codicil in controversy. Apparently, also, each of them mistakenly supposed the test of capacity was the same in both instances, despite our repeated rulings that 'less capacity [is needed] to make a valid will than is sufficient in most cases to transact ordinary business': Thompson v. Kyner, 65 Pa. 368, 382; Guarantee Trust & Safe Deposit Co. v. Waller, 240 Pa. 575. ...... Upon this point, therefore, we need only again state, what we have often said, that, under such circumstances, the opinions of physicians, like those of other experts, are valueless, because being 'opposed to established facts [they] are not entitled to much respect' (Draper's Est.,

215 Pa. 314; Klein's Est., 207 Pa. 191); especially as this character of testimony 'is weak of its kind, and its kind is the very lowest that is ever allowed in a court of justice......[besides which] the entire failure to show a single unbusinesslike act on his [testator's] part, would so far neutralize the theoretical opinions of the physicians as to his mental capacity......[as to render them] insufficient to go to the jury': Central Guarantee Trust & Safe Deposit Co. v. White, 206 Pa. 611, 615."

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellants.