Commonwealth *v.* Gossard, Appellant.

Argued April 19, 1956. Before STERN, C. J., BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Thomas D. McBride*, with him *John Rogers Carroll*, *Raymond J. Bradley*, *Michael von Moschzisker*, *Marjorie Hanson Matson*, and *McBride, von Moschzisker & Bradley*, for appellant.

*David C. Wolfe*, District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, May 21, 1956:

The questions involved in this case are: (1) Whether §345 of the Mental Health Act of 1951 makes the appointment of a Commission *mandatory*, upon the filing of a petition and a psychiatrist's report that the peti-

tioner is mentally ill; and (2) Whether the refusal to appoint a Commission under the facts in the instant case constituted an abuse of discretion.

Defendant was convicted of murder of the first degree with sentence of death. He was represented at the trial by two able experienced counsel. The judgment was affirmed by this Court on appeal. A petition for clemency (commutation to life sentence), accompanied by the report of defendant's psychiatrist, Dr. Leopold, was considered and dismissed by the Board of Pardons. Subsequently, the present petition and supplemental petition for the appointment of a Commission under the Mental Health Act of 1923, as amended in 1951, was filed in the trial Court. Thereafter (according to the petitioner), a "hearing was held before the court at which evidence was presented and argument heard. On the same day the court entered its order denying the appointment of a Commission. Petitioner appeals from this action of the Court."

Defendant was and has been since early youth a sodomist. He was 39 years old and weighed 200 pounds. He was convicted of murder, not because of the commission of sodomy, but *because* the Commonwealth proved that *he attempted to rape* (Karen) a six year old child and in the commission of that act the little girl was suffocated.* Before any further discussion of the facts or analysis of the psychiatric reports, we deem it wise to state the applicable principles of law.

Sections 344 and 345 of The Mental Health Act of June 12, 1951, P. L. 533, 50 PS §§1224, 1225, which amended §308 of the Act of July 11, 1923, pertinently provide: "(1) Any person detained in any penal or correctional institution who is thought to be mentally ill ... [may, by the superintendent, warden, jail physician

---

* *Com. v. Gossard*, 383 Pa. 239, 117 A. 2d 902.

. . . or by any responsible person make application in writing for commitment to a mental hospital].

"Upon receipt of an application, the court shall order an examination of the person sought to be committed by two qualified physicians or a commission."

This Court construed this provision of the Act of June 12, 1951—i.e., an examination of the petitioner—to be discretionary, not mandatory: *Commonwealth v. Patskin*, 375 Pa. 368, 372, 100 A. 2d 472. Section 308 of the Act of July 11, 1923, supra, contained a similar "shall" provision which required the appointment of two physicians or a commission to determine the sanity and mental condition of the petitioner, and that provision was similarly construed by this Court to be discretionary, not mandatory: *Commonwealth v. Barnes*, 280 Pa. 351, 124 A. 636; *Commonwealth v. Scovern*, 292 Pa. 26, 140 A. 611. The reasons for so holding are aptly stated in the Court's opinion in *Commonwealth v. Scovern* and those reasons are equally applicable in the present case.

In *Commonwealth v. Scovern*, 292 Pa., supra, appellant was convicted of murder of the first degree and the jury fixed the penalty at death. When arraigned for trial his counsel moved for a stay of proceedings and the appointment of a Commission to preliminarily inquire into the prisoner's present mental condition.

The petition was made by the resident jail physician and was supported by the affidavit of an alienist and stated defendant was not sane enough to make a defense. It was presented under §308 of The Mental Health Act of 1923, P. L. 998. The Court refused to appoint a Commission and its decision was sustained by this Court which said: "The question before us is whether, under the circumstances, there was an abuse of discretion in refusing to appoint the commission, or wheth-

er a prisoner has in any case a legal right, under the Act of 1923, to demand an inquiry into his sanity.

"A person who, by reason of his insanity, is unable to comprehend his position and to make a rational defense cannot be tried on a criminal charge while in that condition. There must be reasonable grounds on which to base an inquiry as to insanity, and a method of ascertaining the fact.

". . . 'When any person detained in any prison . . . waiting trial . . . shall, in the opinion of the superintendent, jail physician, warden, or other chief executive officer of the institution or other responsible person, be insane, . . . the . . . superintendent . . . shall immediately make application . . . to a law judge . . . for a commitment of [the] . . . person to a proper hospital . . . . The said judge *shall**  . . . order an inquiry by two qualified physicians, or by a commission . . . who shall . . . make written report . . . if, in their opinion, the person so detained is insane . . . . The said judge may, in his discretion, summon other witnesses and secure further evidence. If he is then satisfied that the person thought or alleged to be insane is in fact insane, he shall order . . . removal.'

". . . If, where a petition is presented, the court must ultimately be satisfied of insanity, is it not fair to assume that the legislature intended that the facts and circumstances averred or known should be such that the court would ultimately approve an order of sanity based on such facts and circumstances? This must be so, as it is not to be supposed the legislature intended the judge to do a vain thing. . . .

"If the judge was compelled, under the Act of 1923, to grant an inquiry in all cases, the act would be used as a subterfuge to escape prompt and speedy trials, as

---

* Italics, ours.

the proceeding could be prolonged with little power in the court to stop or order the inquest returned. The legislature had no intention to thus hamper the administration of its criminal laws. The court, as a matter of public policy in the interest of society, charged with the responsibility of administering the criminal law, should not be hindered in its effort to bring the prisoner's case to speedy trial; it should not permit any but a just and sufficient cause to delay the trial. In Com. v. Barnes, 280 Pa. 351, 355, where a petition for an inquest as to sanity was dismissed,* we said: 'Taking into account . . . the substantial weakness of the allegations concerning appellant's mental condition, we cannot say that tribunal erred in dismissing the petition, whether it be considered as an application at common law . . . or as a statutory proceeding.'

"The trial judge is not compelled to grant an inquest in all cases, nor did he abuse his discretion in refusing the petition for the appointment of a commission in this case. He observed the prisoner in the court room, made an investigation of his mental state, received reports from the jail warden, and an alienist, and those having defendant in charge, and found, as stated in the opinion overruling motion for new trial the 'conduct of the defendant . . . showing nothing more than that he was of mean disposition and ever sought to impose his will upon those with whom he came in contact.' We have carefully read the evidence and approve the finding."

While the *Scovern* case and the *Barnes* case were decided under the Act of 1923, the language in that Act and in the amendatory Act of 1951 are *exactly the same*

---

* The petition was presented for the removal of the convicted murderer to a mental hospital; and the petition was accompanied by an affidavit of a physician who examined the prisoner.

on the question here involved—The Act of 1923 provides: "the said Judge shall . . . order an inquiry by two qualified physicians or by a commission"; the Act of 1951 provides: "Thereupon, the court shall order an examination of the person sought to be committed by two qualified physicians or a commission".

*Commonwealth v. Patskin,* 375 Pa., supra; *Commonwealth v. Scovern,* 292 Pa., supra; and *Commonwealth v. Barnes,* 280 Pa., supra, rule the instant case and wisely hold that the appointment of a commission is not mandatory upon the trial Court.

*Was there an abuse of discretion?*

While the appointment of a commission is not mandatory, a Court has no right to arbitrarily or capriciously refuse to appoint a commission; or, if a commission is appointed, it has no right to arbitrarily or capriciously reject the findings or conclusions of the commission. However, it is well to recall that "If a commission is appointed its findings are advisory and not mandatory upon the Court—under the Act [of 1951] it is the Court and not the psychiatrist or the Sanity Commission which must be satisfied that the petitioner is insane or mentally ill. (Sub-section (d) of §345, . . . Upon appeal we should reverse a lower court only for an abuse of discretion or an error of law": *Commonwealth v. Patskin,* 375 Pa., supra, 368, 375, 377. See also to the same effect: *Commonwealth v. Moon,* 383 Pa. 18, 117 A. 2d 96.

It may be wise to add (a) that the test is the prisoner's condition at the time of the petition or commission; and (b) that all the evidence at the murder trial, as well as the prior life record of petitioner may be considered in determining whether he is mentally ill.

The new standard which the Legislature promulgated to guide the commission and govern the Court as to whether defendant was mentally ill is stated in *Com-*

*monwealth v. Moon,* 383 Pa., supra, at pages 28, 29: "At first glance the wordage of the Act would make it appear that every conceivable type of mental illness, with the exception of those specifically excluded, would fall within its scope and require commitment. Upon closer scrutiny it becomes evident that *the controlling factor is the degree or extent to which the mind is affected by the mental disorder** and not the bare existence of symptoms which would induce a psychiatrist to diagnose a mental illness. . . . Here the commission found that appellant possessed well marked symptoms of psychosis which it further characterized as dementia praecox. This condition, a recognized form of mental disorder was, if justifiably diagnosed, within the purview of the Act, but having resolved that appellant was mentally afflicted, the determinative issue was whether that illness so lessened his capacity to use his customary self-control, judgment and discretion as to render it necessary or advisable for him to be under care."

In the light of the foregoing authorities we shall consider the material facts disclosed by the Record. Counsel for petitioner offered in evidence those parts of the petition and supplemental petition which were not denied by the answer; also the reports of the psychiatrists, the first being the report of the Torrance State Hospital and the report of the City-County Clinic of Johnstown and the entire report of Dr. Robert L. Leopold, dated November 29, 1955. Dr. Leopold is a well known psychiatrist who obtained his M.D. in 1946.

Dr. Leopold examined the prisoner psychiatrically and read all the notes of testimony in the murder trial and the report from the Torrance State Hospital and from the City-County Clinic, as well as the relevant parts of the Mental Health Act of 1951. He found that

---

* Italics, ours.

the defendant has been emotionally unstable throughout his life; that he is of normal intelligence; that his vocabulary was above the average in extent but he commonly mispronounced words; that he was unable to elicit any evidence of hallucinations, delusions or illusions; that his judgment about people is and was quite poor; that he didn't recall "too much of his childhood"; that he was an easy-going wanderer; that he was an habitual sodomist; and finally, that he is suffering from a severe mental illness.

Some of the facts which convinced Dr. Leopold that Gossard is and was so mentally ill that he should be confined in a mental hospital were (a) he did household chores for several years when his mother was ill; (b) "it is significant to note that the patient's mother was some years older than the patient's father" [both of whom he loved and both of whom always tried to help him]; "[his] marriage broke up after he had been charged with rape of his wife's best friend . . . Triangular affairs of this sort are clear-cut evidence of marked mental illness"; (c) "Bottle feeding was abruptly cut off at the age of fourteen months"; (d) he [said he] could not clearly recall some of the things he had done in his younger days [of which he was undoubtedly ashamed] and (e) "From a psychiatric standpoint . . . it is inconceivable that he was attempting to penetrate Karen". It is important to note that the trial Court and this Court found that the evidence on this point was clearly to the contrary: see *Commonwealth v. Gossard*, 383 Pa. 239, 117 A. 2d 902, and the detailed opinion of the lower Court. Like the lower Court, we were very unfavorably impressed with the reasoning and deductions contained in Dr. Leopold's report and particularly with some of the factors on which he relied to establish mental illness and require hospitalization.

". . . expert testimony is entitled to little weight as against positive facts. Expert medical opinions are especially entitled to little or no weight when based upon insufficient or (partly) erroneous facts or a feigned state of mind or an inaccurate past history, or upon unreasonable deductions, . . . Cf.: Com. v. Carluccetti, 369 Pa. 190, 202, 85 A. 2d 391; Com. v. Heller, 369 Pa. 457, 462, 87 A. 2d 287; DeMaio Will, 363 Pa. 559, 563, 70 A. 2d 339; Phillips' Estate, 299 Pa. 415, 422, 423, 149 A. 719; Com. v. Wireback, 190 Pa. 138, 42 A. 542.": *Commonwealth v. Patskin*, 375 Pa., supra.

The opinion of President Judge McKenrick, speaking for the Court en banc, is so exceptionally able and sound, that we shall quote a number of excerpts therefrom:

"It will be observed that the Mental Health Acts of 1923 and 1951 make no distinction as to persons alleged to be mentally ill, except mental defectives convicted of first degree murder. Neither is there any distinction as to the type of crime committed; it applies alike to misdemeanors and to felonies. Crimes mala prohibita and those malum in se are within the purview of the acts. Whether the sentence in the case as a convicted defendant is for thirty days or for twenty years, the provisions of these acts may be invoked [upon proper showing]. . . .

"Did the legislature intend to deny to the court conducting the trial any right to exercise its discretion, but make the court a mere conduit through which the proceedings were to pass? . . .

"Surely the legislature, in its worthy effort to protect by hospitalization and medical care those who are *really* (italics our own) mentally ill, did not intend to take away from the courts their right to determine, in the first instance, whether a sanity commission should be appointed and open the flood gates to allow danger-

ous criminals, as well as petty ones, to escape just punishment for their crimes. . . . Any theory of mandatory duty upon the judge to award a commission would result in interminable confusion and unwarranted delay in the execution of every sentence imposed upon a criminal. That the legislature intended to produce such an absurd result is unthinkable. . . .

"Did the court abuse its discretion in dismissing the petition?

"Karen Mauk, a child of the age of six, was found dead in a cemetery in Cambria County on October 28, 1954. The defendant, petitioner, was charged with her murder. . . .

"On January 3, 1955, [after the appointment of able and very experienced counsel], defendant pled guilty to murder. Upon petition of counsel, defendant was committed for examination to the Torrance State Hospital by a state psychiatrist, 'to guide the Court in determining its disposition of the case.' On January 4, 1955, defendant was received at Torrance State Hospital for thirty days observation and examination. On February 14, 1955, defendant was taken to City-County Clinic in the City of Johnstown for psychological and psychiatric examinations.

"On March 2, 1953, the case came to trial before the three Judges of the court. . . The trial proceeded throughout March 2nd, March 3rd and March 4th all day and evening, in 1955, when the testimony closed. The psychiatric reports from Torrance State Hospital and City-County Clinic were made a part of the record.

"A confession of the defendant and other testimony and evidence discloses that the defendant accosted Karen Mauk on a street in the Borough of East Conemaugh, Cambria County, near defendant's home, at about 8:00 o'clock, p.m., on the evening of October 28, 1954. He took her in his automobile to a cemetery in

East Taylor Township, Cambria County, a distance of about two miles. There, he took off all her clothes, except for shoes and sox, laid her on the ground and continued the acts of sodomy he had begun from the time he first accosted the child. Defendant weighed about 200 pounds, and either on top of her or over her and beside her *defendant attempted to commit the crime of rape** upon the body of Karen Mauk. In some manner, the weight of defendant's body caused Karen Mauk's death by suffocation. When defendant discovered that the child was dead, he left her lying naked on the ground, her legs spread apart, and fled the scene. . . .

. . .

"After full arguments by counsel on the law and the facts of the case, the court, consisting of three Judges, on April 18, 1955, found the defendant guilty of murder in the first degree and fixed the penalty at death. . . .

"Defendant came into funds and after his commitment to the penitentiary procured private counsel. . . . Some time prior to November 29, 1955, defendant's counsel had an examination of the defendant made by Dr. Robert Leopold at the Western Penitentiary. . . . At the hearing upon this petition the report of Dr. Leopold and the report of Dr. Baker, psychiatrist at the Western Penitentiary, were made a part of the record and were read and considered by this court. This court had before it also the reports submitted by the Torrance State Hospital and the City-County Clinic, together with the opinion of the Supreme Court, above referred to.

"In all the reports submitted to the court, the history of the defendant as given by him is in substance

---

* Italics, ours.

identical. None of the reports conclude that the defendant is psychotic. He clearly is not a mental defective. . . .

". . . We agree that insanity is not the issue in this proceeding. No one contends for a moment that defendant is legally insane. However, 'mental illness' is defined in Section 102 (11) of the Act of 1951 as 'an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care.' Commonwealth v. Moon, [383 Pa. 18, 27, 28, 29]. . . .

"In the present case, when defendant was confined in the Cambria County Prison before his trial and after, he was under the constant observation of the warden, his deputies and guards. In addition, the prison physician, of nearly fifty years experience, was in attendance on many occasions for treatment of a back injury which defendant had received in 1953. All these persons had talked to and observed the prisoner. Frequent reports to the Judges, by virtue of their membership on the Prison Board, were made by the warden, and never was it even suggested that the defendant was mentally ill in any respect. He conversed fluently and normally, his conduct was good, and except for the strain of his trial and conviction, was a normal individual with a full realization of his predicament.

"When able counsel were appointed, they visited the defendant frequently, discussed all the aspects of his case, and secured every cooperation in preparation for the trial. . . . The Judges hearing the case throughout the trial were in a position to judge of the defendant's demeanor upon the stand. The defendant consulted frequently with his counsel; he was attentive and alert.

"The defendant is a man of intelligence. He recited the details attendant upon the crime. He fre-

quently admitted his acts of perversion, his commission of sodomy, his immoral advances toward his victim. However, he denied that he attempted to commit rape. He knew that an attempt to rape would make his crime murder in the first degree, and so stated on the stand. He argued in his testimony that his sexual satisfactions were secured without heterosexual intercourse, and in addition, that no man in his senses would attempt to penetrate a child when penetration was physically impossible. . . .

. . .

". . . We agree with counsel's proposition that to allow a person to be executed without due process of law would be in violation of our state and federal constitutions. However, due process of law does not require that after the defendant has been tried and convicted he is entitled to what is in effect a second trial on the same issues. Certainly the evidence taken at the trial of this case is relevant in the consideration of the petition for commitment. This court had before it all of the psychiatric reports, including that of Dr. Baker, psychiatrist of the Western Penitentiary. They were studied and became an essential part of this proceeding.

"In the last analysis, the court and not a commission or psychiatrist determines whether the petitioner is mentally ill. . . . 'Such a theory of philosophy [as advocated by defendant] would soon transfer the punishment of criminals from Court to psychiatrists and would inevitably result in a further breakdown of law enforcement and eventual confusion and chaos. Fortunately our cases are opposed to such an undesirable result.'

"We must bear in mind that the historical data in the reports of the psychiatrists came from the defendant, petitioner, himself. . . . Nor do we attach great importance to the fact that Gossard did the cooking and washing for the family household while his mother was

ill. Many boys perform household duties and chores. . . .
The Boy Scout attitude of helpfulness in the home in
our present day is admittedly character-building rather
than character-destroying. . . . He married a woman
four or five years older than himself, nothing unusual,
and the marriage broke up because he had an affair
with his wife's girl friend. If triangular affairs of this
kind are marked evidence of mental illness, as Dr. Leo-
pold states, then a large percentage of those who figure
in our divorce courts are mentally ill and not merely
sexually minded. . . . The vagueness, difficulty with
memory exhibited to Dr. Leopold, is in deep contrast
to his conduct upon the witness stand. He was able
to remember details with marked facility; he parried
questions with his cross-examiner, and only on one or
two occasions during the gruelling cross-examination,
in a prolonged trial, did he lose his composure to any
noticeable extent. He was, in the opinion of this court,
a very smart witness for himself.

". . . From our experience in the criminal courts we
do not believe that all sodomists are mentally ill with-
in the meaning of The Mental Health Act. Many of
them are apparently respectable businessmen, depart-
ment heads, musicians, authors and men with attractive
wives. They just prefer their sex in that form. . . .

"The history reveals a discrepancy in the facts as
related and the facts as proved at the trial with respect
to intercourse with Karen Mauk. . . .

. . .

". . . To say that the defendant just can't help being
a sodomist because he was abruptly taken off the bottle
[at the age of 14 months] . . . is going too far, in our
judgment, in psychiatry . . . If the habitual sodomist is
mentally ill, then by the same token the habitual thief
is mentally ill. . . .

"The defendant in this case is not charged with the commission of acts of sodomy which are beyond his power to resist, according to Dr. Leopold. He is charged with murder committed, not in an act of sodomy but in an attempt to commit rape. . . .

"Psychiatry has its place in our health economy. The danger arises from an attempt to explain every human action by a formula of conduct which may or may not apply. Even in the so-called normal or average individual there are variables that must be considered. There are many reasons why people do things and many things are done without any apparent reason for the act.

"Without further discussion of the report of Dr. Leopold, we believe that none of the psychiatric explanations meet the test prescribed in the Moon case. . . . The penitentiary's psychiatrist, Dr. Baker, who examined Gossard more recently than did Dr. Leopold, finds no mental illness.

. . .

"There is, in our opinion, nothing in the report of Dr. Leopold to indicate that there has been any change in the mental condition of Gossard since his trial. If we apprehend correctly, the psychiatrist would have us believe that the mental illness, now alleged, had existed for some considerable time prior to the murder; that the compulsive forces were operating upon defendant at that time and are still evident in his personality pattern; therefore, defendant's conviction and sentence are psychiatrically wrong. The Supreme Court has said 'You do not have to be a psychiatrist to judge whether a man's actions are normal or abnormal.'

"The Majority of the Judges of this court have had many years of experience in the trial of thousands of civil, criminal and juvenile proceedings. Innumerable parties and witnesses have appeared before this court.

Their demeanor has been observed, the credibility of their testimony has been evaluated—an enormous cross-section of humanity.

"This court, as we have already said, considered all of the psychiatric reports; we considered the Moon case, the facts therein and the rule promulgated in its relation to the present proceeding, together with the record in the appeal of Gossard to the Supreme Court and that court's decision; we have considered the application for commutation of sentence denied by the Board of Pardons. In addition, we have re-read the entire record of the trial in the Court of Oyer and Terminer of this County. In our opinion, this court had not only discretion to grant or refuse the appointment of a sanity commission, but that our discretion was not abused in dismissing the petition under the circumstances."

Upon the record in this case, we find no abuse of discretion by the lower Court in refusing to appoint a commission.

Order affirmed.