## Commonwealth *v.* Melton, Appellant.

344

Argued January 8, 1962. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and O'Brien, JJ.

*James Francis McCort,* for appellant.

*William H. Wolf, Jr.,* Assistant District Attorney, with him *Arlen Specter* and *Robert W. Williams, Jr.,* Assistant District Attorneys, *Paul M. Chalfin,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, March 13, 1962:

Defendant pleaded guilty and then changed his plea to "not guilty" to the murder of *Rose* Schloss. A jury found defendant guilty of murder in the first degree with the penalty fixed at death. The Court en banc granted defendant's motion for a new trial on the ground that an aggregate of prejudicial events, including an emotional outburst by Rose Schloss's bereaved husband, "created such an inflammatory atmosphere that the jury's determination may well have been based upon other than the substantive, factual evidence introduced." The Commonwealth appealed from and asked this Court to reverse the Order which granted defendant a new trial, and to remand the record and direct the judgment of sentence be entered on the jury's verdict. The Commonwealth contended that the grant of a new trial was an abuse of discretion. The appeal of the Commonwealth was dismissed by this Court because the Commonwealth has a right of appeal from an adverse ruling in a criminal case "only where the question involved is purely one of law. . . . Where, however, the reason for the action of the trial court, whereof the Commonwealth complains, is [as here] based upon an admixture of law and fact, the Commonwealth is without any right of appeal therefrom: Commonwealth v. Hartman, 383 Pa. 461-462, 463, 119 A. 2d 211; Commonwealth v. Dolan, 155 Pa. Superior Ct. 453, 455, 38 A. 2d 497:" *Commonwealth v. Melton,* 402 Pa. 628, 168 A. 2d 328.

Defendant contends, as we shall see, that this appeal by the Commonwealth constituted double jeopardy and violated his constitutional rights and entitled him to a discharge.

At the second trial, defendant pleaded guilty to murder and the trial Court, consisting of President Judge HAGAN, Judge WEINROTT and the trial Judge, Judge McCLANAGHAN, after hearing testimony, fixed the degree of guilt as murder in the first degree and, after hearing voluminous testimony concerning defendant's early life and what kind of a man he was and had been, fixed the penalty at death. From this judgment and sentence defendant took this appeal.

Defendant contends he should be discharged because (1) he had been placed in double jeopardy in violation of his Constitutional rights; and (2) the evidence was insufficient to sustain his conviction of murder in the first degree; and (3) the lower Court abused its discretion when it fixed the penalty at death.

The essential and basic requirements to sustain a plea of double jeopardy is that the defendant is being tried a second time for a criminal offense of which he had been previously acquitted: *Commonwealth ex rel. Patrick v. Banmiller*, 398 Pa. 163, 157 A. 2d 214; *Commonwealth ex rel. Farrow v. Martin*, 387 Pa. 449, 127 A. 2d 660, and cases cited therein.

In *Commonwealth ex rel. Patrick v. Banmiller*, 398 Pa., supra, the Court said (pages 164-165) : "A defendant who has been convicted and who has secured a reversal of the judgment of conviction, either on appeal or by the granting of a writ of habeas corpus requiring a new trial, cannot secure his full release. The relator, by applying for the reversal, has waived his protection against being prosecuted again which the provision against double jeopardy (Pa. Const., Art. I, §10) affords him. Relator was not put in jeopardy a second time, since it was only the second trial that resulted

in a valid sentence. [Commonwealth v. Lutz, 200 Pa. 226, 49 Atl. 771] Commonwealth ex rel. Farrow v. Martin, 387 Pa. 449, 127 A. 2d 660 (1956) ; Commonwealth ex rel. Walker v. Banmiller, 186 Pa. Superior Ct. 338, 142 A. 2d 758 (1958) ; P.L.E., Criminal Law §116." Cf. also *Gori v. United States,* 367 U. S. 364.

In *Commonwealth ex rel. Farrow v. Martin,* 387 Pa., supra, the Court said (pages 450-451) : "The provision against double jeopardy exists in the common law and is a part of the Fifth Amendment of the Federal Constitution, and has been incorporated in Article I, Section 10 of the Pennsylvania Constitution. Our constitutional provision is that '. . . No person shall, for the same offense, be twice put in jeopardy of life or limb. . . .' As has been pointed out in prior cases, it does not prohibit more than one trial for the same offense, but only that he shall not be twice in jeopardy. The right of an accused to interpose such plea in proper cases has never been questioned. However, the mere fact that he has once been tried, in itself, is not sufficient to base a plea.

"One is placed in double jeopardy if he has received an acquittal or its equivalent, or a sentence which is no longer subject to attack. Until such legal sentence is imposed, the jeopardy in which he was placed, when first tried, must be deemed to continue until the time of imposition of legal sentence at the subsequent trial. 'Until a convicted prisoner receives a sentence which can withstand attack, it may be conceived that his original jeopardy continues without interruption, and that he is therefore not put in jeopardy a second time when he receives his first valid sentence': King v. United States, 98 F. 2d 291, 295. See also United States v. Ball, 163 U.S. 662, 41 L. Ed. 300, 303; Trono v. United States, 199 U.S. 521, 50 L. Ed. 292; Stroud v. United States, 251 U.S. 15, 64 L. Ed. 103.

"Petitioner may not by his own voluntary action seek and obtain a reversal of judgment, and thereupon take advantage of such reversal to secure full release from punishment properly imposed as a sentence, upon legal conviction at the trial he so obtained. As has been held, relator has waived any benefit of the provision against double jeopardy in order that he might obtain the greater benefit of a review and reversal of his conviction and sentence by the court. See People ex rel. Hunt v. Warden of New York City Prison, 107 N.Y.S. 2d 136; 22 C.J.S., Criminal Law, §273. *To hold otherwise would result in a travesty upon justice.*"*

Defendant concedes, because of a myriad cases so holding, that a second trial for murder which results from his own motion for a new trial or his petition for habeas corpus after he has been convicted of murder in the first degree, does not amount to double jeopardy. Cases, supra. However, he contends that an appeal by the Commonwealth from the lower Court's grant of a new trial sur defendant's motion therefor, completely changed his legal status and even though his motion for a new trial was sustained and the appeal of the Commonwealth was dismissed, he was placed in double jeopardy. It is apparent from the principles enunciated in the foregoing authorities that there is neither reason, logic, nor authority to support this ingenious contention and it is utterly devoid of merit.

Even more astonishing is defendant's second contention that the evidence was insufficient to convict him of first degree murder with penalty of death because the actual killing which occurred during a robbery was done by his accomplice. Defendant was the ringleader in one of the most unnecessary killings and one of the most particularly vicious, atrocious and brutal murders ever committed. Defendant was the

---

* Italics throughout, ours.

plotter and actual leader of the robbery which he planned. When a killing by a felon occurs in or during or in the furtherance or as the result of a robbery, not only the actual killer but all who participated, including the driver of the get-away car, are equally guilty of murder in the first degree, and in the discretion of the jury or as the case may be of the trial Court each can be penalized with death: *Commonwealth v. Shawell,* 325 Pa. 497, 500, 191 A. 17; *Commonwealth v. McManus,* 282 Pa. 25, 27-28, 127 A. 316. See also *Commonwealth v. Coleman,* 402 Pa. 238, 241, 166 A. 2d 525; *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Gilida,* 309 Pa. 501, 164 A. 531; *Commonwealth v. Hart,* 403 Pa. 652, 170 A. 2d 850. There is not the remotest merit to this contention of defendant.

Defendant's third and last contention is that (a) because of his deficient mentality the lower Court did not have the power to find him guilty of first degree murder with penalty of death, or (b) if it had the power to so find, it abused its discretion in imposing the death penalty.

There is not the remotest merit to defendant's contention that because of his deficient mentality, the Court did not have the power to convict him of murder in the first degree.

In *Commonwealth v. Smith,* 405 Pa. 456, we sustained a verdict of guilty of murder in the first degree with penalty of death, even though defendant was a sexual psychopath. We there said (pages 459-460) : "This Court has sustained a verdict of first degree murder with penalty of death where defendant allegedly had an irresistible impulse, was a moron or a mental defective or a sexual pervert or a psychopathic personality, or had been previously confined in the hospital for the criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally defec-

tive moron, or was feeble-minded: Commonwealth v. Leamer, 386 Pa. 485, 126 A. 2d 409; Commonwealth v. Cole, 384 Pa. 40, 119 A. 2d 253; Commonwealth v. Gossard, 383 Pa. 239, 117 A. 2d 902; Commonwealth v. Elliott, 371 Pa. 70, 89 A. 2d 782; Commonwealth v. Carluccetti, 369 Pa. 190, 85 A. 2d 391; Commonwealth v. Givens, 363 Pa. 141, 69 A. 2d 142; Commonwealth v. Neill, 362 Pa. 507, 67 A. 2d 276; Commonwealth v. Howell, 338 Pa. 577, 13 A. 2d 521; Commonwealth v. Hawk, 328 Pa. 417, 196 A. 5; Commonwealth v. Stabinsky, 313 Pa. 231, 169 A. 439.

"A defendant has usually contended—although unsuccessfully—that the presence of one or more of the above mentioned characteristics or mental defects prevents a jury from lawfully convicting him of first degree murder. This defendant makes an unusual although not novel contention, namely—the jury's verdict was an abuse of discretion in the light of his defects and his criminal record. There is no merit in this contention: Commonwealth v. Edwards, 380 Pa. 52, 110 A. 2d 216; Commonwealth v. Elliott, 371 Pa., supra; Commonwealth v. Wooding, 355 Pa. 555, 50 A. 2d 328; and cases cited infra." See to the same effect *Commonwealth v. Graves,* 394 Pa. 429, 147 A. 2d 416; *Commonwealth v. Bibalo,* 375 Pa. 257, 100 A. 2d 45; *Commonwealth v. Leamer,* 386 Pa. 485, 126 A. 2d 409.

The Legislature has vested *in the jury,* and after a guilty plea, *in a trial Court, the power* to determine whether the killing constituted murder and if so murder in which degree; and if murder in the first degree what the penalty (death or life imprisonment) should be: *Commonwealth v. Elmo Smith,* supra; *Commonwealth v. Cater,* supra; *Commonwealth v. Graves,* supra; Act of June 24, 1939, P. L. 872, as amended by Act of December 1, 1959, P. L. 1621, §1.

In *Commonwealth v. Cater,* 402 Pa. 48, 166 A. 2d 44, the Court said (page 55): "In determining whether

the court below abused its discretion in the imposition
of the death sentences we must bear in mind that while
the discretion exercised by a trial court in the imposi-
tion of the death penalty, after a plea of guilty and a
finding of murder in the first degree, is subject to our
appellate review, yet on such review the question be-
fore us is not whether we would have imposed the same
penalty under the circumstances but whether the trial
court manifestly abused the discretion imposed upon it
by the legislature: Commonwealth v. Givens, 363 Pa.
141, 147, 69 A. 2d 142, 144; Commonwealth v. Elliott,
371 Pa. 70, 76-77, 89 A. 2d 782, 785; Commonwealth v.
Phillips, 372 Pa. 223, 228, 93 A. 2d 455, 457."

In imposing the penalty, a Court (after a guilty
plea) must consider (1) the criminal act as well as all
the attendant and surrounding circumstances of the
crime, and (2) also all the evidence, culpatory and ex-
culpatory, incriminating and extenuating, in order to
determine what kind of a man defendant was at the
time of the crime and had been. To epitomize: The
penalty is determined and imposed from a considera-
tion of the crime and the criminal.

In order to determine whether the penalty imposed
by the trial Court was manifest abuse of discretion, we
have considered and shall briefly review not only the
crime and all its attendant and surrounding circum-
stances but also all the evidence, culpatory and ex-
culpatory.

Defendant forgets that after a verdict of guilty, the
test of the sufficiency of the evidence both as to the
crime and the penalty is not the evidence which is favor-
able to him, but the evidence, if any, which justifies
and supports the conviction and the penalty.

In *Commonwealth v. Tyrrell*, 405 Pa. 210, 174 A. 2d
852, the Court, quoting from *Commonwealth v. Nelson*,
396 Pa. 359, 362, 152 A. 2d 913, pertinently said

(page 215) : ". . . ' " 'Defendant, like most defendants, proceeds on the assumption that you must believe all of his statements or confessions; of course, that is erroneous; a jury can believe all or a part of or none of a defendant's statements, confessions or testimony . . .' " : Commonwealth v. Ballem, 386 Pa. 20, 26, 123 A. 2d 728; Commonwealth v. Donough, 377 Pa. 46, 50, 103 A. 2d 694; Commonwealth v. Homeyer, 373 Pa. 150, 153, 94 A. 2d 743.' "

A jury or trial court can similarly believe all or a part or none of the testimony of *any* witness: *Commonwealth v. Shults,* 221 Pa. 466, 70 A. 823; *Ray v. Philadelphia,* 344 Pa. 439, 25 A. 2d 145.

The evidence to support the verdict of guilty of first degree murder with penalty of death may be thus summarized: Defendant found a companion named Rucker. He bought Rucker a drink and told him he needed money badly and suggested that they rob the Schloss home across the street. Defendant led Rucker to the Schloss home and store. He broke in the pavement cellar door about 9 o'clock in the evening. He led the way into the cellar and up the cellar stairs to the first floor. Mr. Schloss, aged 65, and his tiny wife, Rose, who was 63 years old and ill, had just finished supper. When Schloss reached the hallway, defendant grabbed him from behind the hallway door, punched him a couple of times with his fist, dragged him into the kitchen, grabbed a hatchet which had a metal point which weighed one pound and seven ounces, and started striking him on the head. These blows were struck with such force that Schloss's blood was splattered over the entire kitchen and on the floor, the furniture, the walls and even the ceiling. The force of the blows was so strong as to break the head of the hatchet from its wooden handle. Defendant thereupon grabbed a 3 foot brass door chime from the kitchen wall and beat Schloss violently on his head and arms again and again

as he lay helpless on the floor. When Schloss occasionally regained consciousness, defendant would again beat him into unconsciousness.

While defendant was beating Schloss into unconsciousness, his accomplice Rucker grabbed Rose Schloss and forced her into the delicatessen, which was a few feet from the hallway. Rucker knocked her to the floor of the store, then kicked her in the face three times; grabbed a boning knife from the butcher's block and cut her face twice; stabbed her in the neck and twice in the back, and finally plunged a six and a quarter inch blade into the left side of her back and left it sticking there. Rucker then went into the kitchen and told defendant he had killed the old woman. Defendant then handed Rucker a brass pipe with which he had been beating Schloss into unconsciousness and directed him to "Take care of the old man." Rucker then hit Schloss several times, even though he was unconscious. Defendant then went into the delicatessen, opened an empty register and returned to the kitchen. Defendant then took the pipe back from Rucker and began beating Schloss again, demanding "more money, big money." Schloss was able to point to the bureau, which defendant opened and took hundreds of dollars in currency which he found therein. Defendant then said to Rucker, "Let's get out" and they fled, leaving Rose Schloss dead and Schloss apparently dying. Further gruesome details could be added, but are unnecessary. Defendant and Rucker went to a nearby house where defendant counted and divided the money. He further showed what kind of man he was—according to defendant's doctors a dumb mental defective—by cheating Rucker out of $105 of the stolen money which he had hidden inside his sock. After this defendant and Rucker went out in the street and shortly thereafter were arrested. Defendant's trousers, shoes and hands were covered with bloodstains, and the fruits of

the crime were found on him and on Rucker. Both men confessed and reenacted the crime. It is obvious that the actions of the defendant were brutal and bestial almost beyond belief.

So much for the crime; what kind of man was defendant? Defendant's wife* testified in his behalf that he was a hardworking man who gave her adequate support until he started to drink.

Defendant's witness, Dr. Yale S. Nathanson, an experienced psychologist, examined defendant on May 11, 1961, for approximately 2 hours and 45 minutes. This examination consisted of taking a long personal history of defendant and the administration of many psychological tests. In one of these tests Melton achieved a 65 I.Q. On the performance scale test defendant achieved a 69 I.Q., which is characterized as a borderline defective mentality. Ten percent of the American people fall within this class. The doctor found that defendant could not remember the ages of his five children. A quick evaluation test and other quick tests revealed to the doctor that defendant had a mentality of an 8 or 9 year old, and was below the fifth grade in schooling. Actually, however, defendant had completed the ninth grade at St. Joseph's Industrial School at Clayton, Delaware, and had received a diploma from the school; and the doctor admitted he had never investigated defendant's scholastic progress there, even though he considered that that information was important.

In discussing the crime the doctor found defendant's attitude to be "peculiar." He did not have any degree of remorse over what happened to Mr. and Mrs. Schloss, but was concerned with telling the doctor how bad Herman Rucker was and blaming everything on

---

* From whom he was separated.

Rucker,[*] his accomplice in the crime. Furthermore, defendant served in the Marine Corps from January 22, 1952 until March 11, 1953, when he was discharged because of flat feet. The doctor did not know what defendant's tests had shown when he entered military service. He did not make any investigation of defendant's background or his history as defendant related it, and he admitted that he did not know whether defendant was telling the truth about his background. Dr. Nathanson testified that a person of defendant's mentality could understand that "one shouldn't hit or hurt and do damage."

Dr. John G. Torney, an experienced neuropsychiatrist, also testified for the defense and found defendant to be mentally defective. His mental abilities were generally inferior and he was emotionally unstable. However, Dr. Torney testified that defendant was able to distinguish between right and wrong, and equally important he observed defendant to be reticent during the examination and he was of the opinion that *defendant was intentionally not doing his best* in the tests because of his fear of being severely punished.

Dr. Robert S. Middleton, a psychologist working under Dr. Torney, testified for the defense that the tests made by him indicated that defendant was a mental defective. Once again, this Court is asked to abandon and abolish the M'Naghten Rule and to substitute in its place a psychiatrically devised rule, or the rule promulgated in *Durham v. U. S.,* 214 F. 2d 862, or in the recent case of *United States v. Currens,* 290 F. 2d 751. Once again we reaffirm as we recently did in *Commonwealth v. Elliott,* 371 Pa. 70, 89 A. 2d 782, in *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d

---

[*] Instead of demonstrating that defendant was mentally defective or had a backward or low or defective mentality, this indicates to us intelligence and cleverness.

356

98; and in *Commonwealth v. Tyrrell,* 405 Pa. 210, 221, 174 A. 2d 852, our support of the M'Naghten Rule and we reject all suggested substitutes.

The reports and opinions of psychiatrists and psychologists should be considered by the trial Court, together with all the other facts and evidence, but such reports and opinions are in no way controlling, and neither a jury nor a trial Court has to believe or give complete credence or any credence whatever to the opinion of the psychologists and of psychiatrists: *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98; *Commonwealth v. Cater,* 402 Pa., supra; *Commonwealth v. Elliott,* 371 Pa., supra; *Sommerville Will,* 406 Pa. 207, 177 A. 2d 496; *Commonwealth v. Patskin,* 375 Pa. 368, 100 A. 2d 472; *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287.

In *Sommerville Will,* 406 Pa., supra, the Court said: "These facts aptly illustrate the wisdom of the well established rule that the opinion testimony of medical experts is of very little weight or value when opposed to factual evidence: Williams v. McCarroll, 374 Pa. 281, 97 A. 2d 14; Conway Will, 366 Pa. 641, 79 A. 2d 208; DeMaio Will, 363 Pa. 559, 70 A. 2d 339; Sturgeon Will, 357 Pa. 75, 53 A. 2d 139; Cookson's Estate, 325 Pa. 81, 188 A. 904; Phillips's Estate, 299 Pa. 415, 149 A. 719 [Commonwealth v. Woodhouse, 401 Pa. 242, 260, 164 A. 2d 98]; Commonwealth v. Gossard, 385 Pa. 312, 321, 123 A. 2d 258; Commonwealth v. Patskin, 375 Pa. 368, 375, 100 A. 2d 472; Commonwealth v. Heller, 369 Pa. 457, 461, 87 A. 2d 287; Dawson v. Pittsburgh, 159 Pa. 317, 325, 28 A. 171."

In *Commonwealth v. Patskin,* 375 Pa., supra, the Court said (pages 375-376): "Expert medical opinions are especially entitled to little or no weight when based upon insufficient or (partly) erroneous facts or a feigned state of mind or an inaccurate past history, or upon unreasonable deductions, . . . ."

In *Commonwealth v. Elliott*, 371 Pa., supra, the Court said (pages 77-78) : ". . . the trial Judge or Court may make its own appraisal of the defendant's mental capacity or moral responsibility, his history, education, mentality and background and what the appropriate punishment or sentence should be, based upon the facts of the crime and all of the evidence presented as well as its observations at the trial: [cases cited]."

In the instant case the conclusions of the expert medical witnesses were based (1) to a considerable extent on defendant's own unsubstantiated history of himself, and (2) on their failure to know and properly evaluate the fact (a) that defendant had completed the ninth grade at and had graduated from school and (b) that he was in the Marine Corps for over a year and (c) that one of defendant's own doctors was of the opinion that defendant was intentionally faking and (d) that defendant's own actions—which spoke louder than words—showed that he was not mentally deficient as depicted by the psychologists and psychiatrists but was a person who had sufficient mentality to premeditatedly plan this robbery, direct and participate in this brutal crime, and thereafter cleverly cheat his own accomplice in the division of the spoils and then attempt to extricate himself by blaming everything on his accomplice.

In *Commonwealth ex rel. Simon v. Maroney*, 405 Pa. 562, 176 A. 2d 94, Mr. Justice MUSMANNO said (p. 567) : ". . . 'while tests showed that Simon's mental age was about nine years, we understand that a person with a chronological age of eighteen and a mental age of nine is a far different person from one both physically and mentally aged nine. The fund of knowledge and experiences acquired during the years increases the capabilities and understanding of such a person far beyond that of a nine year old child. (Clinical Psychiatry by Dr. Arthur P. Noyes, page 310).' "

In *Commonwealth v. Elliott*, 371 Pa. supra, the Court said (page 75-76) : "Defendant contends that because a criminal or murderer is a weak, unstable, aggressive, dangerous moron who is mentally deficient the sentencing Judge or Court (1) must consider his record during his entire life and particularly reports of every psychologist and psychiatrist who has examined him, and (2) must be controlled by these reports and impose a sentence in the case of murder in the first degree not higher than life imprisonment. This contention carries the theory or doctrine of 'diminished responsibility' to an extreme and would vest in a psychiatrist and not in the Courts the right and power to determine and fix punishment for crimes. Such a theory or philosophy would soon transfer the punishment of criminals from Courts to psychiatrists and would inevitably result in a further breakdown of law enforcement and eventual confusion and chaos. Fortunately our cases are opposed to such an undesirable result."

The trial Court heard and carefully considered all of the circumstances pertaining to Melton from his earliest youth to the time for imposition of the penalty, and wisely concluded* ". . . it was our judgment, on careful balance, that this twenty-nine year old man who participated in the brutal crime must pay the supreme penalty, and that this case was an appropriate one for the death penalty, if any is.

. . .

---

* Defendant complains that the opinion of the lower Court failed to set forth in detail the reasons and grounds for their opinion. While a detailed review of the evidence which was considered in determining the penalty as well as detailed reasons for the penalty it imposed, are sometimes desirable, sometimes necessary and at other times unnecessary, no more detailed reasons were necessary in this case than those given by the trial Court, in view of the record which so amply supports their imposition of the death penalty. Cf. *Commonwealth v. Elliott*, 371 Pa., supra.

"This court is of the unanimous opinion that the sentence imposed in this case was a proper one, necessary to protect the interests of society."

We find no error of law or abuse of discretion.

Judgment and sentence affirmed; the County of Philadelphia to pay all the costs including commensurate counsel fees to court appointed counsel.

Mr. Justice COHEN concurs in the result.