Gibbons, Circuit Judge, dissented and filed opinion.

Seitz, Chief Judge, dissented and filed opinion.

Hastie, Circuit Judge, dissented and filed opinion.

Abraham J. Brem Levy, Philadelphia, Pa. (John A. Papola, Court-appointed, Peter J. Liacouras, Philadelphia, Pa., on the brief), for appellant.

James D. Crawford, Deputy Dist. Atty., Chief Appeals Div., Philadelphia, Pa. (Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, Pa., on the brief), for appellee.

Argued Dec. 17, 1970

Before HASTIE, Chief Judge, and FREEDMAN and GIBBONS, Circuit Judges.

Reargued May 11, 1971

Before HASTIE, Chief Judge, and SEITZ, VAN DUSEN, ALDISERT, ADAMS, GIBBONS and ROSENN, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case, petitioner, a state prisoner attacks his convictions for first-degree murder and conspiracy to murder, principally on the ground that he was mentally incompetent [1] and thereby unable to assist counsel during the arraignment and the degree of guilt hearing which followed the entry of his plea of guilty to murder generally. In addition, Phelan alleges that the trial court denied him effective assistance of counsel when it rejected motions to hire investigators and experts, and to provide for a mental examination; that the trial court did not make an adequate inquiry as to the voluntariness of the guilty plea; and that the trial court erred in refusing to depart from the McNaughten test of criminal responsibility.

## I

During the early morning hours of June 19, 1964, Judith Lopinson and Joseph Malito were shot to death in the basement of Dante's Restaurant.[2] Petitioner was arrested for this crime on July 26, 1964. Two days later, he confessed, describing in gruesome detail how he and Jack Lopinson carefully planned for over a period of three weeks and then perpetrated the brutal and bloody murders.[2a] He then testified at a state habeas corpus proceeding brought by Lopinson, who had also been arrested and charged with murder.[3] Two weeks later, Phelan retained an experienced member of the criminal bar, John Patrick Walsh, Esquire, to represent him.

Several eminent psychiatrists examined Phelan at various times. On August 7, 1964, he was examined by Drs. Torney and Hayes, of the Neuropsychiatric Department of the Quarter Sessions Court; on August 10, 1964, he was examined on behalf of the Commonwealth by Dr. Keyes; on September 24 and 25, 1964, Phelan was examined by Drs. Anderson and Cole, at the request of prison officials; and on October 24, 1964, only two days prior to the arraignment, an examination was conducted by Drs. Leopold and Spoont, who were retained by Mr. Walsh. Phelan was arraigned on indictments for murder and conspiracy to commit murder on October 26, 1964, and after an extensive inquiry into the voluntariness of his action, he entered guilty pleas to murder generally and to the conspiracy charge.

Following the guilty pleas, and in accordance with Pennsylvania law, a three-judge court was convened to determine Phelan's degree of guilt. That court was composed of Judge Alexander, Judge Sloan, and Judge, now Justice, Barbieri. The three-judge court ruled on all of the pre-trial motions. On December 24, 1964, Phelan was again examined by a psychiatrist, Dr. Appel, at Mr. Walsh's request. In July, 1965, Phelan prepared and submitted a request that his counsel be discharged and that new counsel be appointed.[4] Shortly thereafter, attorney Walsh petitioned to withdraw as counsel on the ground that the

1. This petition was presented by counsel after Phelan refused to sign it. Throughout the entire proceedings, Phelan has eschewed the insanity defense and has asserted his competence.

2. The restaurant was owned jointly by Jack Lopinson, Judith's husband, and Malito.

2a. The confession came about as a result of Phelan's initiative, and was made after officials advised him of his rights. Counsel retained by Phelan's family was available, but his services were declined by Phelan.

3. Phelan also testified at length at Lopinson's trial in January and February of 1965. Lopinson was convicted of murder in the first degree, and this conviction was affirmed by the Pennsylvania Supreme Court. Commonwealth v. Lopinson, 427 Pa. 284, 234 A.2d 552 (1967), vacated, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968).

4. A copy of this hand printed petition appears in the record (10a). It demonstrates that immediately before the degree of guilt hearing, Phelan had an understanding of the nature of the proceedings pending against him.

relationship between himself and Phelan had deteriorated to the point where Walsh could no longer effectively represent Phelan. This petition was granted on July 27, 1965. On the same day, in the presence of the Court, Phelan personally filled out the appropriate forms for the appointment of new counsel. And on August 2nd, new counsel was appointed.[5]

Soon after appointment, Phelan's counsel presented various motions to the trial court, including motions for authorization to hire an investigator, for the production of various records, and to withdraw the guilty pleas. The motions for the production of records were agreed to by the district attorney; the other motions were renewed on October 11, 1965, the date scheduled for the trial on the question of the degree of guilt. Although the trial court ruled that it would receive relevant testimony in regard to the withdrawal of Phelan's guilty pleas, none was presented, and the motions were denied. An appeal was taken to the Pennsylvania Supreme Court, which quashed the appeal, per curiam. (No. 109, Oct. 11, 1965).[6]

On October 13, 1965, the day the degree of guilt hearing was held, counsel again moved to withdraw the guilty pleas, this time because of "newly discovered evidence" that Phelan finally learned that he would not be entitled to a jury trial and a defense. The motion was denied. At one point, Judge Alexander noted that "we think the various motions suggested undoubtedly by your client who is taking a very alert part in these proceedings, does attempt to play fast and loose with the Court." Motions were also made for the authorization to retain a psychiatrist to determine Phelan's criminal responsibility, his competency at the time of the arraignment, and his competency to participate in the degree of guilt hearing. The arguments then became quite confusing. It is significant that when Judge Alexander explicitly brought to Mr. Levy's attention that the court had already decided the question of an examination to determine competency to stand trial, partially on the basis that Mr. Levy specifically declined to ask for such examination, Mr. Levy stated he meant that he did desire the examination for that purpose, and that if he said otherwise, then "I was suffering from a mental aberration." The court indicated that it had been expecting receipt of the report of the psychiatric examination conducted by the defense, but counsel had failed to have it delivered. Judge Sloane particularly questioned the defense regarding Phelan's ability to participate. Mr. Levy indicated his main concern was with the McNaughten Rule, and his efforts to withdraw the guilty pleas:

> "Judge Sloane: That is No. 1. No. 2 is are you in this petition for a mental examination of Mr. Phelan asking that permission in order to determine

5. Abraham J. Brem Levy, Esquire, and John A. Papola, Esquire, both very experienced lawyers at the criminal bar, were appointed by the trial court, and since then have continued to represent Phelan with vigor.

6. On October 11, 1965, after the appeal had been quashed, while Phelan was present, defense counsel formally renewed his petition to retain psychiatrists to determine whether Phelan "could comprehend or know mentally what was happening at the particular time."

   "Judge Alexander: At which time?
   "Mr. Levy: When he is alleged to have pleaded guilty on October 26, 1964. * * *"

   * * * * *

   "Judge Barbieri: May I ask a question of Mr. Levy? Your request for psychiatrist, is that * * * in what connection?
   "Mr. Levy: In connection with my petition to set aside the guilty plea. * * *"

   * * * * *

   "Judge Alexander: * * * Now if you want it to determine the mental condition of the defendant now, that is another question and that seriously raises a question.
   "Mr. Levy: No, at the time he pleaded.
   "Judge Barbieri: He is not trying to decide if the man can stand trial.
   "Mr. Levy: That's right."

whether or not your plea will be not guilty by reason of insanity?

"Mr. Levy: That is the second barrel. The first one is that he is not guilty at all, but I can't use that, if the Court pleases, until we get rid of the plea of guilty. * * *"

The court then considered Phelan's competency to stand trial, as distinguished from Phelan's criminal responsibility.

"Judge Sloane: Mr. Levy, I refrain from being a prophet and take the law as it is, and there are two elements of it, one is the Mental Health Act of 1951, as to Mr. Phelan's ability to consult with counsel and prepare his defense, that is one thing. The other one is McNaughten.

"Mr. Levy: We will stand on McNaughten as far as his condition is today.

"Judge Alexander: May I categorically ask you, you take the position that he is in a position to stand this hearing and trial now?

"Mr. Levy: That he is not.

"Judge Alexander: On the ground that he did not know the difference between right and wrong?

"Mr. Levy: Right now.

"Judge Alexander: He did not know then and he does not know now?

"Mr. Levy: No, we are not talking about then; we are talking about now."

* * * * * *

"Mr. Sprague: * * * The issue right now, if we are talking about this man's competency, isn't even McNaughten. That has nothing to do with the tests that exist for a man's mental condition for purposes of going on with the proceedings. * * *"

The court overruled all of the petitions. Another petition for an investigator was then filed, discussed and granted. The trial court examined the psychiatric reports, heard the Commonwealth's case,[6a] refused to hear psychiatric testimony or consider psychiatric reports going to criminal responsibility —counsel had conceded that all of the psychiatrists agreed Phelan was criminally responsible under the McNaughten test—and again overruled the defense motion for psychiatric examination for competency to participate in the proceedings.

On October 15, a further hearing was conducted to determine the degree of guilt, at which Phelan's attorneys attempted to introduce medical reports and testimony on the issue of responsibility. Prior to the hearing, defense counsel read into the record his recollection of a conference between himself and the court in chambers. Counsel's recitation was interrupted by Judge Sloane, who stated: "My accurate memory is that I would allow a psychiatrist if the question were McNaughten *or if the question were the inability of the defendant to consult with counsel or to form the judgment that he usually can form in going ahead with his defense.* * * * That is why I am ready this morning to hear what the offer of proof is as to a psychiatrist." (emphasis added).

Following lengthy discussions, the following stipulation was introduced into the record:

"Mr. Levy: * * * It is stipulated and agreed by Abraham J. Brem Levy and John A. Papola, attorneys for defendant Frank Phelan, and Richard A. Sprague, Assistant District Attorney, counsel for the Commonwealth that the defense will offer evidence from psychiatrists. Reports from all available sources at this time are attached to this stipulation, both from the prosecution and from the defense, to prove that the defendant Frank Phelan could not and was not capable

6a. Although the Commonwealth presented no psychiatric testimony at this point, it was ready to introduce medical reports to the effect that Phelan was responsible under McNaughten. In fact, the trial court had read these reports, and they were put into the record formally when the sentence was considered.

of forming the specific intent necessary to commit murder in the first degree and that his mental condition would prohibit him from being able to form the necessary mens rea to commit murder in the first degree, that said psychiatrists would be asked to answer the following questions:

'Are you aware of the fact that the defendant is charged with commission of the crimes of having feloniously, wilfully and with malice aforethought killed and murdered two people, which indicates that he indulged in certain acts with a certain contemporaneous frame of mind? Doctor, based on your examination'—

"Mr. Sprague: I take it what you are saying now, these are the questions you would propound to the psychiatrist in line with this offer of proof.

"Mr. Levy: Yes.

'Doctor, based on your examination and report, what is your opinion as to whether the defendant Frank Phelan is psychotic?

'Doctor, explain to the Court what you mean by "psychotic".

'Doctor, would you say from your examination and report that this defendant is suffering from a mental disease or defect or illness?

'Doctor, would you say from your examination and report that this mental defect, disease or illness was a causal connection or related to the act or crime for which the defendant stands accused?

'Doctor, from your examination and report would you say that at the time of committing the prohibited act or acts the defendant as a result of mental disease or defect lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated?'

"Judge Sloane: The first one is Durham and this one is Curran [sic]?

"Mr. Levy: Yes. We wrote it so it would exactly reflect Durham and Curren, sir."

When the district attorney's objection was sustained because the purpose of the testimony was, in effect, to ask the court to overrule McNaughten and to adopt the *Curren* and *Durham* test, counsel declined to offer other evidence on the issue of intent bearing on the degree of guilt, although the court indicated that such evidence would be accepted for that purpose.[7] Phelan was then pronounced guilty of two counts of first degree murder and one count of conspiracy to murder. Thereafter, all of the psychiatric reports were read into the record on the issue of mitigation of the sentence. Court was adjourned until October 19th, when the death sentence was imposed.

The judgment of the trial court was appealed to the Pennsylvania Supreme Court, which affirmed the convictions. Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967). Six major issues were considered by that court: (1) the right to an investigator, (2) the adequacy of the arraignment, (3) the withdrawal of the guilty pleas, (4) the requested psychiatric examinations, (5) inadmissibility of evidence as to responsibility, and (6) the refusal to grant a continuance.

The Supreme Court of Pennsylvania recognized the right of every indigent to the effective assistance of counsel and that for counsel to be effective adequate investigation is often necessary. However, the court held that the denial of the motion to provide an investigator did not in this case violate the United States Constitution. It based its holding on the following factors: the purpose of the investigation was to determine if improper means (including drugs) were used to elicit the confession; Phelan's denial of the administration of

7. According to Pennsylvania law, testimony of the nature proffered would have been inadmissible. *See* Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966); Commonwealth v. Carroll, 412 Pa. 525, 194 A.2d 911 (1963).

any drugs; the complete access given counsel to all court files, statements, and medical records; and the lack of any claim of coercion or involuntariness.

The Supreme Court considered the arraignment procedure in detail. The primary objection by counsel was that the bills of indictment had not been read into the record, although the record did indicate that after an extensive colloquy with court and counsel,[8] Phelan was arraigned. However, based on the record and the trial judge's statement that he recalled the reading of the bills, the Supreme Court ruled that all of the proper procedures had been followed and that all of the basic requirements for a valid arraignment had been met.[9]

Following that discussion, the Supreme Court ruled on the denial of the motion to withdraw the pleas. It noted that the burden of proving that he did not understand the nature and effect of the guilty pleas is on the defendant, and held that he had not met that burden because he made no attempt to prove his allegations and because he never disclosed to the court the factual nature of his after-discovered evidence. Factors militating against a finding of abuse of discretion by the trial court were Phelan's manifestations of comprehension at the time of the plea, the presence of competent counsel at the entry of the plea who never suggested that defendant did not understand the nature and effect of the pleas, the lapse of nearly a year before the claim of mental incompetence was raised, the spontaneous nature of the first confession, and the two voluntary appearances in court where Phelan admitted, under oath, that he committed the killings.

The denial of the motions for psychiatric examination was also affirmed. With regard to the examination to determine criminal responsibility and competency at the arraignment, the Supreme Court noted that defense counsel at the time of the arraignment had reports of examinations of a number of psychiatrists, some of whom had examined Phelan at the request of former counsel, that all the reports indicated that Phelan was responsible under the McNaughten rule, and that one of the reports was dated October 24, 1964, only two days prior to the entry of the pleas. The Supreme Court also took cognizance of defense counsel's disavowal at trial of any challenge to Phelan's competency to participate in the trial, and that the panel of judges expressed willingness to hear such evidence if it were deemed necessary.

Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815 (1966), was distinguished on two grounds: That the holding there was based on the requirement of an Illinois statute and "[m]ore importantly, the evidence in this record warrants no such [bona fide] doubt [as to competency]." 427 Pa. at 278, 234 A. 2d at 548.

The Pennsylvania Supreme Court next held, on the basis of Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966), that the trial court did not commit error in refusing to admit evidence which, under the McNaughten rule, was not relevant to the issues of criminal responsibility or degree of guilt. Finally, the court ruled that the trial court had not abused its discretion in refusing a continuance of the hearings on October 11, 1965.

Phelan's counsel petitioned for rehearing, and after the petition was denied in November, 1967, petitioned the United States Supreme Court for a writ of certiorari. That petition was denied in May, 1968. Phelan v. Pennsylvania, 391 U.S. 920, 88 S.Ct. 1803, 20 L.Ed.2d 657.

Four months after the writ of certiorari was denied, Phelan's attorneys petitioned the district court for a writ of

8. The colloquy is reprinted in 427 Pa. at 269–270, 234 A.2d at 543–544.

9. The basic requirements were stated as ascertaining the identity of the accused, informing the defendant of the nature of the charges, and informing the court of defendant's plea. 427 Pa. at 273, 234 A.2d at 545.

habeas corpus. Judge Luongo, out of an abundance of caution, scheduled hearings during September, 1969, and extensive testimony was taken. Phelan's evidence included his own testimony, that of Drs. Leopold, Appel and Keyes, and that of Mr. Papola. The Commonwealth produced Mr. Walsh and John Rogers Carroll, Esquire, Walsh's associate at the time of the trial. In addition, the psychiatric report of Dr. Sadoff, who examined Phelan at his attorney's request on September 29, 1969, was made a part of the record. Essentially, the same issues were litigated in the federal forum as in the state proceedings: Phelan's competence, denial of effective assistance of counsel,[10] arraignment and the McNaughten rule. In addition Phelan's competence to participate in the habeas proceedings was severed.[10a]

In May, 1970, the district court filed its opinion denying the petition. United States ex rel. Phelan v. Brierley, 312 F.Supp. 350 (E.D.Pa.). Prior to discussing the legal issues, the district court reviewed the factual background of the case, and outlined the contentions asserted in the petition.

The first issue considered by the district court was Phelan's competence to participate in the state proceedings. On this issue, the court considered the testimony of Phelan, one of his present attorneys, both of his previous attorneys, and three of the physicians who had examined and reported on defendant in 1964. On the basis of this evidence, much of which was available during the degree of guilt hearing, the district court found as a fact that Phelan was "competent to understand, on a rational and factual level, the nature of the proceedings [arraignment and trial] against him, and to consult with counsel." 312 F.Supp. at 353.[11]

10. Although the thrust of this argument in the Pennsylvania Supreme Court centered around the right to the services of a private investigator at public expense, in the habeas proceeding the emphasis shifted to the refusal of the trial court to permit the withdrawal of the guilty pleas.

10a. In view of the various grounds raised in Phelan's petition, the fact that a habeas hearing was held at all does not imply that the state court record left doubt as to Phelan's competence.

11. The following is an excerpt from the district court's opinion on this issue:
"The most illuminating testimony on this issue was pressented by Phelan himself and his former counsel, John Patrick Walsh. Walsh testified that he interviewed Phelan a number of times before the arraignment proceedings took place. He had had Phelan examined psychiatrically and had available the psychiatric reports, and concluded that Phelan was competent to enter a plea and to stand trial. Walsh based his opinion on his own observations of Phelan, Phelan's ability to communicate with him, and the statements which Phelan made to him. According to Walsh and his associate, John Rogers Carroll, *Phelan never denied the killings.* Phelan also told them that if the district attorney wanted to convict Jack Lopinson, the district attorney would have to play ball with him (Phelan).

*He admitted to counsel that he had made up the stories about having hallucinations (which had led at least one psychiatrist to believe he was schizophrenic).* Walsh testified that prior to arraignment, he consulted with Phelan in regard to the plea that would be entered. After his own investigation into the crime, Walsh saw no alternative but to attempt to save Phelan's life by pleading guilty. He explained to Phelan the charges pending against him, the problems with a jury trial, the results and possible consequences of pleading guilty. After the matter was thoroughly reviewed and discussed, and after Walsh's recommendations were considered, Phelan decided to plead guilty.
   *    *    *    *    *
"Phelan's statements to Walsh also indicate that Phelan knew what he was doing. Further, in the letter which Phelan sent to Walsh advising that he was going to dismiss him as counsel, Phelan evidenced more than a rudimentary grasp of the law and of his rights. "Phelan's performance at his hearing was even more enlightening. * * * In my view Phelan was not a truthful witness, but he did convince me, by the manner in which he responded to questions in the emotionally disturbing atmosphere of cross-examination, that he was not only competent, but shrewd and cunning as well.

The district court next discussed Phelan's allegation that he was denied the effective assistance of counsel on the basis that the trial court refused to allow him to withdraw his pleas of guilty, thereby preventing counsel from defending on the merits. This claim was rejected on the ground that the right to withdraw a plea is not absolute, and since counsel did not produce the available evidence eventually produced at the habeas hearing, the action of the trial court was neither arbitrary nor capricious. Therefore, the restricted scope of the defense did not result in inadequate assistance of counsel. The court also ruled that the refusal to grant funds to hire an investigator and a psychiatrist, and to grant a continuance did not violate Phelan's constitutional rights.[12]

Judge Luongo then considered Phelan's contention that the lack of a verbatim transcript of the arraignment vitiated that proceeding by establishing that the indictment was not read and that Phelan did not plead guilty thereto.[13] Counsel asserted that reviewing courts could not "impeach" the transcript by either assumptions of regularity or extrinsic evidence. The district court, being bound by the ruling of the Pennsylvania Supreme Court, found no merit to Phelan's claim that his rights were violated by an invalid arraignment.[14]

The fourth point disposed of by the district court's opinion was the argument that the McNaughten test of criminal responsibility violates due process of law.[15] The court reasoned that "[d]ue process does not require that Pennsylvania abandon the M'Naghten rules in favor of any particular federal standard of criminal responsibility" for several reasons: (1) the United States Supreme Court in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), refused to impose any other standards upon the states; (2) the *Durham*[16] rule was still subject to criticism; (3) the majority of jurisdictions still retained McNaughten as the appropriate test; and (4) the present state of scientific knowledge did not dictate a new rule.

The final ruling of the district court, based on a psychiatric examination conducted shortly after the habeas hearing, held that Phelan was competent to participate in the habeas corpus proceedings. Significantly, that holding is not under attack here.

Following the decision of the district court, Phelan's attorneys appealed the denial of the petition to this Court. On March 8, 1971, the panel which heard the argument reversed the order of the district court unless the Commonwealth would grant Phelan a hearing as to present competency, a new hearing on the withdrawal of the guilty plea, and if

"A review of the State record likewise reveals that in the instances where Phelan was called upon to answer questions, he did so in an intelligent and responsive manner, and in other instances he interjected statements into the court proceedings which indicated an awareness and comprehension of what was taking place.

"I find, therefore, that Phelan was fully competent to understand the nature of the proceedings against him and to consult with counsel both at the time of arraignment in October 1964, and at the trial in October 1965." 312 F. Supp. at 354–355 (emphasis added; footnotes omitted).

12. In this regard, the district court opinion adopted the reasons set forth by the Pennsylvania Supreme Court. 427 Pa. 265, 234 A.2d 540 (M 67).

13. The colloquy preceding the arraignment is set forth in the transcript verbatim. The record then noted: "Defendant, arraigned at the bar of the court, pleads guilty to Bill No. 468, Murder, and to Bill No. 469, Murder."

14. The habeas court indicated that even were it not so bound, it would reach the same result via the same reasoning, because all the purposes of the arraignment had been fulfilled.

15. This was the main thrust of counsel's argument before the habeas court and the Pennsylvania Supreme Court.

16. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862 (1954).

that motion be denied, a new degree of guilt and penalty hearing. The Commonwealth petitioned for rehearing, and on April 6, 1971, the opinion and order of March 8th were vacated. Subsequently, the case was re-argued to the Court en banc. We now affirm the order of the district court.

II

Appellant's first contention here is that he was denied effective assistance of counsel and due process of law when the trial court denied his various petitions and motions for leave to hire special investigators, leave to hire psychiatric experts, for continuances, for mental examination, and for leave to change his plea from guilty to not guilty.

Most of these matters have been exhaustively considered on direct appeal by the Pennsylvania Supreme Court and by the district court in the habeas proceeding, and need not be expounded upon at length here. The Pennsylvania statute authorizing appointed counsel to petition for leave to hire an investigator or expert assistants, is addressed to the discretion of the court, which is to approve the request only if "counsel shall sustain their request by evidence satisfactory to the court * * *" 19 P.S. § 784 (1964). In view of the information available to defense counsel at the time their motions were presented, including Phelan's testimony in the Lopinson case where he was cross-examined as to his treatment by the police and prison officials, Phelan's prison medical records, Phelan's statements to the police, and the reports of Drs. Leopold and Appel who examined Phelan at the request of his prior defense counsel, we agree with the district court that Phelan's rights were not violated by the trial court's rulings on these requests for investigators, psychiatrists, and a continuance.

Phelan's contention that the trial court abused its discretion in not allowing the withdrawal of the guilty pleas is similarly without merit. The basis for the withdrawal is that it was not until a year after the pleas were entered that Phelan learned he would not receive a jury trial. Rule 320 of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix provides that "[a]t any time before sentence, the court may, in its discretion, permit or direct a plea of guilty to be withdrawn and a plea of not guilty substituted." And, the Pennsylvania Supreme Court has held that a trial court had not abused its discretion in refusing to allow a murder defendant to withdraw his plea of guilty where the plea was entered voluntarily and intelligently and where the defendant had been represented by counsel. Commonwealth v. Batley, 436 Pa. 377, 260 A.2d 793 (1970). *See also*, Commonwealth v. Scoleri, 415 Pa. 218, 202 A.2d 521, 203 A.2d 319 (1964). Federal law, interpreting a similar rule of federal criminal procedure is not to the contrary. United States v. DeCavalcante, 449 F.2d 139 (3d Cir. 1971); United States v. Ptomey, 366 F.2d 759 (3d Cir. 1966). At the time the pleas were entered, Phelan was represented by one of Philadelphia's most competent defense attorneys. It was on his advice that Phelan decided to plead guilty. The trial court and the prosecutor examined Phelan at length on the issues of voluntariness, consequences, and knowledgeability of the pleas. The district court found as a fact that counsel explained to Phelan the "problems with a jury trial, the results and possible consequences of pleading guilty." 312 F. Supp. at 354 (footnote omitted). There is no claim that the attorney who was counsel at the time of the guilty plea rendered incompetent advice, or performed his duties with less than normal competence. Consequently, we believe that Phelan has not met the burden of proving his pleas were invalid, United States ex rel. Grays v. Rundle, 428 F.2d 1401 (3d Cir. 1970) and we cannot conclude that the state trial court abused its discretion in denying the motions to withdraw the pleas.

III

Phelan next argues that he was mentally incompetent when he pleaded guilty and when he participated in the degree of guilt hearing, and that as a result of mental illness he was not criminally responsible for the slayings. He contends, therefore, that the trial court was required to hold an evidentiary hearing as to his competence, and that his conviction violates due process.

If Phelan were incompetent at the times in question, then we would be bound to reverse the district court and order that the writ of habeas corpus issue unless a new trial be held. However, the district court found that Phelan was competent at the time of the pleas and at the time of the degree of guilt hearing, and this finding must be affirmed unless it is clearly erroneous or unless the district court erred in interpreting Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), when it declined to issue the writ and order a new hearing on competency.

In Pate v. Robinson, as in this case, there was a collateral attack on a state conviction for murder. Although Robinson denied killing the victim, his court-appointed counsel claimed that Robinson was not guilty because he was insane at the time of the shooting and was incompetent to stand trial. He was convicted, and the judgment was affirmed by the Supreme Court of Illinois, on the grounds that the evidence failed to raise a sufficient doubt as to competency to stand trial, thereby relieving the trial court of its obligation to conduct a hearing on its own motion, and that the evidence did not raise a reasonable doubt as to sanity at the time of the offense.[17] The federal district court dismissed the habeas corpus petition, but the court of appeals reversed.

At Robinson's trial, four witnesses testified as to his long history of "disturbed behavior" and that they were of the opinion he was insane. The evidence included medical records of state and county hospitals in which he had been a patient. The testimony related violent episodes of erratic behavior, and described outbursts at his mother's house resulting in damage to furniture, an incident at an aunt's house during which Robinson stated that someone was trying to kill him, fights with his wife during which he tried to incinerate her clothing, the shooting of his son, his subsequent attempted suicide, and the killing for which he was tried.[17a] In rebuttal, the state introduced only a stipulation that a physician would testify that Robinson knew the nature of the charges against him and could cooperate with counsel. The court refused to allow the state to introduce testimony by the doctor on the issue of insanity. The United States Supreme Court held that Robinson did not deliberately waive the defense of competency to stand trial by failing to demand a sanity hearing, that the evidence presented raised a bona fide doubt[18] as to Robinson's competency, and that under Illinois statutory and case law the trial judge was required under such circumstances to impanel a jury and hold a sanity hearing on his own motion.[19]

17. The Supreme Court denied certiorari, 368 U.S. 995, 82 S.Ct. 618, 7 L.Ed.2d 533 (1962).

17a. There was no evidence or indication that Robinson was attempting to "play fast and loose with the [c]ourt."

18. The Supreme Court noted that the stipulated testimony of the psychiatrist and Robinson's demeanor at trial might be relevant to the issue of sanity, but were not dispositive on the issue of competence.

19. Pennsylvania law required the trial judge to order a sanity hearing "only where a real doubt exists" in his mind, Commonwealth ex rel. Mulligan v. Smith, 156 Pa.Super. 469, 40 A.2d 701, 703 (1945), but unlike Illinois law, imposed no obligation to conduct a sanity hearing in the absence of a request. Commonwealth ex rel. Smith v. Ashe, 364 Pa. 93, 71 A.2d 107 cert. denied, 340 U.S. 812, 71 S.Ct. 40, 95 L.Ed. 597 (1950). *See also* Commonwealth ex rel. Harris v. Banmiller, 10 Pa.Dist. & Co.R.2d 525,

There is no doubt that a conviction of an accused person while he is mentally incompetent violates due process of law, and that state procedures must be adequate to protect against such violation. *See* Pate v. Robinson, *supra.* But Phelan's case is distinguishable from Pate v. Robinson on a number of grounds other than the statutory distinction relied on by the Pennsylvania Supreme Court and referred to in footnote 19, *supra.*

In Pate v. Robinson, counsel merely neglected to demand a sanity hearing, although sanity was the central and indeed the sole issue in that case. Here, however, although counsel presented inarticulate requests for such hearing for various purposes, there was an obfuscation of defendant's position when he constantly shifted his emphasis from ground to ground.[19a] It is clear from the record that defendant's primary objective was to secure permission to withdraw the guilty pleas. At the time the requests were filed, the defense was already in possession of several psychiatric reports specifically exploring criminal responsibility and competency at the time of the arraignment. After the petition to withdraw the guilty pleas was denied and the appeal quashed, defendant moved again for permission to retain psychiatrists for inquiry into "[w]hy he is alleged to have pleaded guilty. * * *" This intention was manifested several times, and even though Judge Alexander specifically asked if the examination would go to present mental condition, counsel replied: "No, at the time he pleaded." On October 13, 1965, defense counsel again equivocated as to the purpose of the examinations requested. In overruling the motion, Judge Alexander noted that he would order the appointment of a psychiatrist if Phelan's capacity to participate in the degree of guilt hearing became doubtful. Judge Sloane, in an off-the-record conference later read into the record, stated that he would allow the appointment of a psychiatrist for this purpose. Although counsel was allowed to place on the record an offer of proof with regard to psychiatric testimony, and such offer and proposed questions were stated for the record, neither the offer of proof nor the questions were directed toward the issue of capacity to participate in the degree of guilt hearings. Indeed, a reading of the entire record reinforces the conclusion that Phelan and his counsel were embarked upon a course of action aimed at withdrawal of the guilty pleas, and would not have been content with an examination for any other purpose than to determine competency at the time of the arraignment. Phelan's apparent conflict with his counsel reflected his personal approach toward achieving this common goal.

Pate v. Robinson required that a sanity hearing be conducted "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial * * *" 383 U.S. at 385, 86 S.Ct. at 842. The evidence before the court there consisted of uncontradicted testimony of a number of lay witnesses, eight-year-old hospital records, and a stipulation as to part of the testimony of one psychiatrist. Here, however, there was no affirmative testimony as to Phelan's incompetence, before the state trial court, although that court indicated on several occasions it would receive such evidence.

More importantly, in addition to viewing Phelan's participation in his own defense, the trial court had before it the reports of Drs. Leopold, Appel, Anderson, Cole, Tornay, Keyes, Torney and Hayes. These reports not only assessed Phelan's medical, psychiatric and neurological conditions, but also discussed his intelligence, prior history, family back-

aff'd, 391 Pa. 132, 137 A.2d 452, cert. denied, 356 U.S. 947, 78 S.Ct. 794, 2 L.Ed.2d 822 (1958). The Court of Appeals for the second circuit recently held that Pate v. Robinson requires no more than that the state courts follow the applicable state law. (United States ex rel. Evans v. LaVallee, 446 F.2d 782 (2d Cir. 1971).

19a. Judge Sloane, on one occasion, pointedly reminded counsel of the Mental Health Act of 1951, *see supra*, p. 77, but counsel never presented a proper petition.

ground and societal orientation. At least one of the reports unequivocally stated that Phelan is "competent to confer with counsel in the preparation of his defense"; and not one report stated that he was incompetent to proceed. No evidence which would indicate that Phelan's mental condition had changed between the date of the examinations and the date of the trial was introduced. No real attempt was made to secure a hearing on the issue of capacity to proceed or to empanel a lunacy commission under the Mental Health Act of 1951. When the Commonwealth closed its case, Phelan's counsel declined to produce any evidence going to his ability to stand trial. It is clear that the quantity and quality of the evidence presented here differed substantially from that introduced in Pate v. Robinson. It was not on the basis of just one report, but on the comprehensiveness of the evidence that the Pennsylvania Supreme Court concluded that no bona fide doubt was warranted. And certainly such conclusion is not unreasonable. *See* United States ex rel. Evans v. LaVallee, 446 F.2d 782 (2d Cir. 1971).

With regard to the district court's order, Phelan argues that it erred when it found as a fact "that Phelan was fully competent to understand the nature of the proceedings against him and to consult with counsel both at the time of the arraignment in October, 1964, and at the time of the trial in October, 1965." It is contended that the district court should have issued the writ unless the state should hold a competency hearing and retry Phelan, should he be found competent. Similar relief was granted in Pate v. Robinson, but there such a course was required, once it was determined that the issue of competency had not and could not be properly resolved, because of the barren state of the record in that case. It would have been difficult for psychiatrists in 1966, when the Supreme Court issued its mandate, to have evaluated Robinson's mental condition in 1959, the date of the trial, despite the conclusory testimony of lay witnesses, because Robinson had not testified, and because no trained psychiatrist had observed Robinson during the period of alleged insanity. *See* Crail v. United States, 430 F.2d 459, 461 (10th Cir. 1970). In Phelan's case, however, the record is replete with expert testimony based upon psychiatric examinations conducted contemporaneously with the events in question during the period of alleged incompetence. It was on the same testimony and evidence, not the lack thereof, that Phelan's counsel grounded his prayer for federal relief. The district court had the benefit of observing Phelan throughout the entirety of the habeas proceeding, including the rendition of his testimony in his own behalf. In addition, Attorney Walsh testified as to his observations during the period of his representation of Phelan. And after Phelan waived the attorney-client privilege, by testifying as to what he had told Mr. Walsh, Mr. Walsh further testified that Phelan had admitted lying to at least one of the examining physicians about having hallucinations, causing that physician to diagnose Phelan's mental condition erroneously as schizophrenia. These facts clearly distinguish this case from Pate v. Robinson, and there is nothing in that case which indicates that the relief which obtained there is compelled here. Therefore, it was not error for the district court to determine Phelan's mental condition when the pleas were entered or when the degree of guilt hearing was held. Because there is credible expert and lay testimony in the record to support the factual finding of the district court that Phelan was competent at these critical times,[19b] such finding is not

19b. For example, the report of Dr. Baldwin Keyes stated that: Phelan "is responsible before the law for his behavior" and that some of his conduct during the examination "was more of an 'act' than a true compulsive drive. It was as though he wanted this to fit in with his story." Dr. Keyes testified at the habeas hearing that Phelan was competent at the arraignment. On cross-examination, Dr. Appel corroborated the opinion of Dr. Keyes.

clearly erroneous and may not be disturbed.

In this regard, one other factor is worthy of mention. Shortly after the habeas hearing, a psychiatric examination of Phelan was conducted by Dr. Robert Sadoff at the request of Phelan's counsel. The report of that examination was made a matter of record. On the basis of it, as well as Phelan's performance during the habeas proceedings, the district court found as a fact that Phelan was competent to participate in such proceedings. That finding was not contested on appeal, and we therefore treat it as correct. In any event, it cannot be considered clearly erroneous because it is supported by sufficient evidence in the record. If Phelan was competent to participate in the habeas hearing, he would be competent to participate in any further state proceedings which might be held, unless he can demonstrate that his mental condition has changed significantly since the date of Dr. Sadoff's examination.

## IV

Phelan's final arguments center around the issue of his criminal responsibility for the offenses for which he was prosecuted. In particular, he argues that he was denied due process when the trial court held that the McNaughten rule was the sole test for determining criminal responsibility in Pennsylvania, and refused to admit psychiatric testimony as to responsibility and mens rea not relevant to that standard, but relevant to some other standard. He further argues that the Supreme Court of Pennsylvania in Commonwealth v. Negri, 419 Pa. 117, 213 A.2d 670 (1965), has recognized that the Third Circuit Court of Appeals is "for all practical purposes, the ultimate forum in Pennsylvania," and therefore, the Pennsylvania courts are obligated to follow the test of United States v. Currens, 290 F.2d 751 (1961), as the law of Pennsylvania on criminal responsibility.

The conduct of the trial court in refusing to admit the evidence in question was in conformity with Pennsylvania law. The Pennsylvania Supreme Court adopted the McNaughten rule shortly after it was promulgated. Commonwealth v. Mosler, 4 Pa. 264 (1846). The continued vitality of the rule was affirmed in 1960 by the comprehensive opinion in Commonwealth v. Woodhouse, 401 Pa. 242, 164 A.2d 98. Again, in Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966), the Pennsylvania Supreme Court adhered to its earlier decision, and in Phelan's case, the specific rulings of the trial court on this issue were considered and validated: 427 Pa. 265, 234 A.2d 540. Although we are aware that the McNaughten rule has been much criticized and that many jurisdictions have adopted other rules,[20] the United States Supreme Court has refused to require the states to adopt any other standard. Leland v. Oregon, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).[21] Accordingly, it is not appropriate for us to impose our rule, or any other rule, upon the Commonwealth of Pennsylvania at this time.

Phelan's argument that the Pennsylvania Supreme Court has, on its own initiative, adopted the *Currens* test as its own is without merit. No Pennsylvania case so holds, and *Negri* is clearly inapposite.

Therefore, it was not a violation of due process for the original trial court to apply the McNaughten test of crimi-

20. Indeed, this Court has adopted a modified version of the *Durham* rule, *see* Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), as the applicable test of criminal responsibility in federal trials in this circuit. United States v. Currens, 290 F.2d 751 (1961).

21. In part, the decision in *Leland* was based on the fact that "the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law." 343 U.S. at 801, 72 S.Ct. at 1008. The district court found as a fact that science has yet to progress to that point.

nal responsibility, and to restrict the admission of evidence based on that test.[22]

V

For all of the reasons stated above, we hold that the district court's findings of fact were not clearly erroneous and that the district court did not err as a matter of law. Accordingly, its order dismissing Phelan's petition for habeas corpus will be affirmed.

GIBBONS, Circuit Judge (dissenting).

This appeal presents for review an extraordinarily complex mixture of factual and legal contentions, many of which are being advanced on appellant's behalf by court assigned counsel over his objection strenuously expressed. At the same time contentions which appellant would like to have considered were not considered by the Pennsylvania courts or by the district court for reasons which I hope will become apparent in this opinion. Ordinarily in a dissenting opinion I would be content with the development of the facts and pleadings outlined by the majority, and would discuss only the ultimate factual or legal issues on which we disagree. Here, however, we seem to be in disagreement even over what happened in the state court. Thus a more detailed treatment of the record, as it appears to me, is in order. That record discloses this chronology:

On June 19, 1964, about 4:00 A.M. Judith Lopinson and Joseph Malito were shot to death in the basement office of Dante's Restaurant in Philadelphia. That restaurant was owned by Malito and Jack Lopinson, Judith's husband. When the police arrived they found Jack Lopinson, suffering from a gunshot wound in the leg, with the two bodies. On July 15, 1964, after an inquest by the Medical Examiner of Philadelphia, Jack Lopinson was charged with murder and held for action by the grand jury. On July 25th appellant was arrested in connection with another incident. While he was in custody the police learned from another source that appellant had bragged about committing the murders at Dante's Restaurant. On July 26th appellant was charged with the murders and a hearing was held before a magistrate who committed him to Holmesburg prison on the murder charges pending action by the grand jury. At this time appellant made some statement to the police about disposing of the murder weapons, but did not admit participating in the murders. On July 27th appellant summoned the senior official at Holmesburg prison to his cell and told him "he wanted to confess who committed the murders down at the restaurant." (S.R. 295).[1] A prison official called the homicide detectives and the next morning appellant was taken to police headquarters for questioning. There he gave a detailed, signed written statement consisting of thirteen pages (S.R. 195). Before that statement was taken he was warned that he could remain silent, that the statement could be used against him, and that he had a right to counsel. (S.R. 198). During the course of the interrogation he was informed that an attorney named Simone, retained by appellant's father, wished to see him. He was advised that Mr. Simone could be present but replied that he did not want to see Simone. (S.R. 209). Appellant's statement was

22. The parties did not raise, and we do not decide whether in the factual context of this case, the imposition of the death penalty constitutes a violation of the Eighth Amendment. We do note, however, that the Supreme Court recently has granted certiorari in four cases where the issue is whether, on the facts of each case, the death penalty constitutes cruel and unusual punishment. *See* Aikens v. California, 403 U.S. 952, 91 S.Ct. 2280, 29 L.Ed.2d 863, Furman v. Georgia, 403 U.S. 952, 91 S.Ct. 2282, 29 L.Ed.2d 863, Jackson v. Georgia, 403 U.S. 952, 91 S. Ct. 2287, 29 L.Ed.2d 863, Branch v. Texas, 403 U.S. 952, 91 S.Ct. 2287, 29 L.Ed.2d 864 (1971).

1. References to the record in the Pennsylvania proceedings (Exhibits P–1 and P–2 in the habeas corpus case) will be designated (S.R.-). References to the habeas corpus record are designated (H).

to the effect that Jack Lopinson had hired him to kill Judy Lopinson and Joseph Malito for pay, and to wound Jack Lopinson so as to create the appearance of a robbery or an underworld "hit." The statement details weeks of planning, including a trip to Delaware to purchase the murder weapons, describes the execution of Mrs. Lopinson and Malito in graphic detail, tells how he wounded Lopinson, and how and where he disposed of the guns in the Delaware River. Preparation of this written statement on July 28, 1964, was interrupted so that appellant could testify for the Commonwealth in a habeas corpus proceeding brought by Jack Lopinson. (S.R. 211). In open court he was fully warned of his constitutional rights, and he testified in detail how Jack Lopinson and he planned and carried out the execution of the two victims, how he wounded Lopinson, and how and where he disposed of the murder weapons.

Appellant was then returned to Holmesburg, where on August 7, 1964, he was examined by Dr. J. G. Torney and Dr. Martin Hays of the Neuropsychiatric Department of the Quarter Sessions Court. (S.R. 398–405). Their report concluded:

> "Therefore, while his personality structure appears to be highly neurotic in nature he is not legally insane and is competent to confer with counsel in the preparation of his defense.
>
> DIAGNOSIS: Competent to confer with counsel in the preparation of his defense."

On August 10, 1964 appellant was examined on behalf of the Commonwealth by a psychiatrist, Dr. Baldwin L. Keyes. His report (S.R. 382–393) is prefaced by this summary (S.R. 382):

> "This man is mentally clear. He recognized the nature of his homicidal act. He had planned it carefully and thought he had escaped well after the execution of it. He knows the nature of the penalties likely and discussed them freely and without any apparent emotion.
>
> "The question of responsibility here may be considered qualified on the basis that he does not have average normal control over his compulsive drives, and has a very considerable amount of psychopathology in the background.
>
> "His scattered way of talking, his inappropriate emotional tone, his inadequacy in managing his compulsive drives, the possibility of occasional hallucinosis, are all in line with a prepsychotic pattern.
>
> DIAGNOSIS: Sociopathic Personality Disturbance. Dissocial Reaction.
> Aggressive and Hostile Behavior.
> Not a psychotic, but there is a lot of psychopathology, with a very low level of self-control.
>
> PROGNOSIS: Very poor. Will be a problem even in prison.
> If he becomes psychotic it will probably be in the direction of transient psychotic episodes occurring under gross stress situations such as long continued confinement, or threat of death, without the ability to combat any of it.
>
> LEGAL OPINION: This man is responsible before the law for his behavior."

On August 11, 1964, appellant was indicted.

About that time appellant's father retained John Patrick Walsh, Esq. to represent him and Mr. Walsh entered an appearance on August 14, 1964. On September 24 and 25, 1964, at the request of prison officials, Dr. Norman E. Anderson and Dr. D. H. Cole, psychiatrists, examined Phelan. Dr. Anderson's report, after reviewing the fact that appellant was considered by the prison officials to be very dangerous, spoke of other murders he had committed, claimed to hear voices, and had a desire to kill people, said:

> "RECOMMENDATION: It is felt by all custodial officers and psychiatrists who have seen Phelan lately that he is extremely dangerous to himself and to others. A definite diagnosis of functional psychosis at this time cannot be made since he is so belligerent, negativistic and threatening. It is certain at least that he is only recently recog-

nizing the nature and seriousness of his crime and apparently was in a dissociated state when seen previously. He certainly needs further psychiatric evaluation because his mental picture is changing and he may eventually become more classically psychotic." (S. R. 369).

Dr. Cole's report mentions that some individuals, prison officials apparently, were concerned as to whether or not appellant was having an acute psychotic depression. The report states:

"Dr. Anderson and I agreed that this man was a chronic psychotic with a very poor impulse control in which there is an erotic urge to kill. There is evidence that practically no inhibiting force exists in this man's personality to counteract the urge to kill. The only direct evidence of classical legal psychosis is the fact that he hears his own voices telling him to do this. The psychosis is manifested not so much in irregularity or thought disorder but in extremely emotional color blindness when it affects the lives of others." (S.R. 372–373).

Between August 14, 1964, when he entered his appearance, and October 24, 1964, Mr. Walsh and his associate, John R. Carroll, Esq., interviewed appellant on a number of occasions. On October 24, 1964, Dr. Robert L. Leopold and Dr. M. Lawrence Spoont, retained by Mr. Walsh, examined appellant. They had the benefit of the background investigation made by a psychiatric social worker for the Neuropsychiatric Department of the Court of Quarter Sessions. They found appellant oriented as to time, place and personal identity. Among other things they reported:

"He is paranoid to virtually all who come in contact with him, including not only the authorities of the Court, and the physicians who have examined him, but also his own attorneys and family. (S.R. 353).

* * * * * *

DIAGNOSIS:

"From the psychiatric standpoint, there is no question whatsoever in our minds that this man is suffering from severe, chronic, progressive schizophrenia. He is impulse-ridden, delusional, hallucinatory, and without insight. We desire to stress that he is a thoroughly dangerous human being who has no control whatsoever over his own aggression and who, because of his paranoia, can be expected to kill at any time that he is under what for him is sufficient emotional pressure. It is further to be stressed that his level of tolerance for any emotional pressure is minimal.

PROGNOSIS:

"The prognosis is extremely poor. This man has a lifelong pattern of psychosis, has no insight, and no desire to change.

RECOMMENDATIONS:

"From the medical standpoint, this man should be confined to a maximal security mental hospital for the indefinite future. If his behavior cannot be controlled by drugs, he should be considered a candidate for prefrontal lobotomy since this may be the only way his violent anti-social impulses can be controlled.

"We are aware that the McNaughton formulation of criminal insanity includes only the concept of whether a man knows the difference between right and wrong. On an intellectual level, Frank Phelan can make this distinction. It is, however, meaningless to him because such an intellectual concept is overwhelmed totally by his psychotic needs." (S.R. 354–355).

On October 26, 1964, appellant appeared with his attorney, Mr. Walsh, in the Court of Quarter Sessions for arraignment on the murder and conspiracy

indictments. (S.R. 70 et seq.). He was interrogated by the court at length, and pleaded guilty. The court accepted these pleas, and granted the Commonwealth's request that the cases be continued indefinitely.[2]

Appellant was examined on December 24, 1964, by Dr. Kenneth E. Appel, a psychiatrist, at the request of Mr. Walsh and Dr. Leopold. His report (S.R. 356–366) includes the following:

> "He had delusions of grandeur that he could manage anything and everything, protect himself, rely on himself, even against the electric chair. * * * He is suspicious, distrustful and had delusions of persecution—even toward people who want to help him. * * *
>
> "His memory is satisfactory, but interfered with by impulses to express his destructiveness, his compulsion to kill, his negative and destructive feelings toward other people and their destructive feelings toward him. (S.R. 363).
>
> * * * * * *
>
> "* * * The drive he has is almost a monomania which interferes with his thinking, judgment, conforming behavior. He is not free to think logically or perceive reality, especially reality as it is. Delusions and hallucinations interfere with the normal sequence of thought, ideas, relevancies and behavior * * *
>
> "The diagnosis is mental disease—Severe Intense Paranoid *Schizophrenia,* in my opinion,—with delusions of grandeur, persecution and compulsion to kill.
>
> "He is a very dangerous, uncontrolled person filled with destructiveness.
>
> "The prognosis is poor under any form of treatment, even I believe with extensive and high dosage of drugs. "Maximum security is indicated." (S.R. 364–365).

On January 29, 1965 appellant testified in the murder trial of Jack Lopinson. His testimony is reproduced at S.R. 252–294. His attorney, Mr. Walsh, was present throughout his testimony. At this trial he repeated the story of his conspiracy with Lopinson to kill Mrs. Lopinson and Joseph Malito. That testimony in all its lurid detail is consistent with his July 28, 1964 statement and his July 28, 1964 testimony. Lopinson was convicted of first degree murder. Before and during that trial Lopinson moved to have appellant examined by a court appointed psychiatrist, but these motions were denied. See Commonwealth v. Lopinson, 427 Pa. 284, 234 A.2d 552 (1967).

On July 14, 1965, appellant wrote a letter (Petitioner's Exhibit 3, habeas corpus case) to Mr. Walsh advising that he wanted to withdraw his guilty plea and contest his guilt, that he wanted a court appointed attorney other than Walsh, and directing Walsh to destroy all psychiatric reports in his possession. On July 19, 1965, appellant addressed a handwritten petition (S.R. 10) to the Pennsylvania court judge who had accepted his guilty plea, advising that he had discharged Walsh and requesting the appointment of new counsel. On July 26, 1965, Mr. Walsh filed a petition to withdraw as counsel (S.R. 12) in which Mr. Walsh advised the court:

> "7. Petitioner avers that for approximately one month prior to the filing of this petition, the professional relationship between petitioner and defendant has deteriorated to such an extent that petitioner is of the opinion that he can no longer give this defendant effective representation in this major criminal trial.

2. The continuance after the guilty plea had significance beyond sentencing because in Pennsylvania when a defendant enters a plea of guilty to a charge of murder a panel of three judges ordinarily hears the Commonwealth's evidence and determines if the case constitutes murder in the first degree. If a majority of the judges determines that the crime was first degree murder the sentence shall be either the death penalty or life imprisonment. 18 P.S. § 4701. Commonwealth v. Scoleri, 415 Pa. 218, 202 A.2d 521, 203 A.2d 319 (1964); Commonwealth v. Cole, 384 Pa. 40, 119 A.2d 253 (1956). See Rule 1115, Pa. Rules Crim.Pro., adopted 1968.

8. Petitioner further avers that defendant will not lend his cooperation to the obtaining of witnesses whom petitioner deems material when his case is called before the Court for trial and with respect to said witnesses has told petitioner that he does not want them present in Court."

Both petitions were heard on July 27, 1965, by the three judge panel which had apparently been scheduled to take testimony that day on the degree of guilt. By this time appellant had also filed a pro se motion for copies of the court records in the Jack Lopinson case. At this hearing Mr. Walsh was permitted to withdraw, and appellant with the assistance of the court filled out a form requesting court appointed counsel. Several times in this hearing he denied his guilt and demanded a jury trial. Typical of his testimony is this:

> "I'll tell you like this then—last year I was shanghaied off Locust Street and since that time I have been psychologically coerced and suppressed, you understand, and oppressed to say different things, you understand.
>
> Now I said I would say these things provided certain people wasn't bothered, you understand, bothered by the capitalistic cops. And I said if Jack Lopinson got the chair, I had to get the chair, you understand.
>
> Now the point now is people said I kept tracking on District Attorney Sprague in the meantime to see what's on their mind. And I told them either they give me the chair or nothing, you know.
>
> Q. Well—
>
> A. Wait a minute, wait a minute. I'm asking you a question. They said now the story's supposed to be now I'm a nice guy and they want to pack me off nice and quiet for a life bit. I ain't taking no life bit. You either snuff me out or cut me off.
>
> Meantime, I can't afford to pay John Walsh no money to fight no case. And I just want to say for the record with reference to any criminal acts alleged to have been perpetrated by me, I now confirm nothing and strenuously deny everything. Boom." (S.R. 84–85).

At the end of the hearing this colloquy took place:

> [Appellant]: "I'd like to ask you one question. Mr. Sprague said about this guilty plea and I just said I'm not guilty of nothing. If the lawyer that put that guilty plea in has withdrawn, that should also be withdrawn.
>
> Judge Alexander: That doesn't automatically withdraw the plea.
>
> [Appellant]: I'm still not guilty, understand?
>
> Judge Alexander: You want to change your plea from guilty to not guilty?
>
> [Appellant]: I'm not claiming my plea was one by me.
>
> A Woman: (Standing in the courtroom)
> Your Honor, Your Honor, that man is sick. He is positively sick." (S.R. 93–94).

The woman spectator probably was appellant's mother.

On August 2, 1965, the court appointed Abraham J. Brem Levy, Esq. and John A. Papola, Esq. to represent the defendant. Obviously Mr. Levy and Mr. Papola were in for a hard time, for by now it was abundantly clear that appellant would not cooperate in preparing for a degree of guilt hearing, but was insisting on the withdrawal of his guilty plea and a jury trial. On September 23, 1965, these attorneys were notified that the degree of guilt hearing would proceed on October 11th. Prior to October 11th they went to the Eastern States Correctional Institution, where appellant was confined, to discuss with him a petition to withdraw his guilty plea, and he refused to see them (S.R. 98). Such a petition was prepared, signed by counsel and filed on appellant's behalf on October 8, 1965. On October 11, 1965, at the court's direction in open court appellant also signed this petition (S.R. 98). Counsel indicated that they were not prepared to go forward with testimony in support of the petition because they

needed additional time to locate witnesses who would testify on that issue. For reasons which do not appear but may well be imagined they did not put appellant on the stand in support of the petition. The court denied the petition to withdraw the guilty plea (S.R. 126). Counsel then occupied several hours in an unsuccessful attempt to take an interlocutory appeal to the Pennsylvania Supreme Court from this ruling. That appeal was promptly quashed on the state's motion (S.R. 130). At the end of the day on October 11th, after that appeal had been quashed, Mr. Levy made a motion (S.R. 132a–1): "* * * for leave to file a petition to retain a psychiatrist so that the court and the defendant could have the benefit of the psychiatrist's report as to whether he could comprehend or knew mentally what was happening at the particular time—", referring to the date of the guilty plea. He referred specifically to his desire to use the psychiatrist on the question of withdrawal of the guilty plea. (S.R. 134). The court replied that they had already ruled on that (S.R. 134–135). An inquiry was made a few minutes later about use of the psychiatrist on the question of guilt if the plea stands and about his use to determine appellant's present mental condition. One judge said:

> "Now if you want it to determine the mental condition of the defendant now, that is another question and that seriously raises a question."

Mr. Levy replied "No, at the time he pleaded." (S.R. 140). The motion was denied. Two observations must be made about this reply. First, it came at the end of a long and often confusing day. Second, it was consistent with the appellant's position that the only thing he was interested in was a jury trial following the withdrawal of his guilty plea. This is made clear in the record when on the next page appears:

> "Mr. Papola: Before the Court recesses, and with due respect to the Court, I have been requested to make a statement to the Court by Mr. Phelan himself. Therefore, I feel that it becomes my duty and my obligation to make his statement to the court.
>
> He has advised me, Your Honor, that if the Court intends to proceed on a guilty plea on Wednesday, that he feels there is no necessity for his counsel to be present because he feels that it would be a useless gesture on the part of his counsel to be here and in any way to adequately and properly defend him because he feels that there is nothing to defend him from. He feels that he wishes to go on trial on a not guilty plea, that he is not guilty in fact." (S.R. 141).

Counsel were in the difficult position of having serious reservations about appellant's competency, while he had none. Competency in October but incompetency at the time of the plea was a position consistent with appellant's wishes.

The court ordered that the degree of guilt hearing proceed on Wednesday, October 13, 1965.

On October 13th counsel presented to the court three petitions, two of which were signed by the appellant in court that morning during a recess. Mr. Levy explained the reason for the late filing: "* * * because of the mental condition of this defendant we were unable to get through to him earlier than we actually did get through." (S.R. 149). The petition signed by appellant presented a new motion to withdraw the guilty plea because appellant never knew until the evening of October 11, 1965, that as a result of his August guilty plea he would not have a jury trial and a defense. The petition was denied. Another petition, signed by counsel, sought:

> "* * * that the court authorize counsel to retain a psychiatrist or psychiatrists to examine the defendant in an effort to ascertain whether he was of sufficient mental capacity to understand the nature of the acts complained of; his alleged arraignment; and the proceedings to assess the degree of guilt presently before the court, or to participate in the proceedings." (S.R. 40).

Clearly this petition tendered three issues:

(1) appellant's criminal responsibility;

(2) appellant's competency at the time of his arraignment and guilty plea;

(3) appellant's competency to participate in the degree of guilt hearing.

This colloquy took place:

"Judge Alexander: We passed upon two of those matters yesterday, that is, at the time the act was committed and at the time he entered his confession. And yesterday I asked you, 'Do you want an examination for his condition now?' And you said, 'No,' to the Court.

Mr. Levy: I said yes.

Judge Alexander: You said no yesterday.

Mr. Levy: Then I was suffering from a mental aberration." (S.R. 157–158).

We can appreciate that Mr. Levy was under considerable stress on the occasion to which Judge Alexander referred, since appellant still was pressing his demand to withdraw his guilty plea and go to trial before a jury, and counsel, over appellant's objection, was pressing contentions respecting both criminal responsibility and competency. In any event it was made clear on October 13th that counsel wanted an examination to determine appellant's *then* mental condition. *See, e. g.* (S.R. 164). The proceedings became quite confused about this point, because counsel, while pressing the point that they were concerned about appellant's present competency, still were simultaneously pressing a legal argument that the court should adopt a test for criminal responsibility other than the M'Naghten Rules. Thus, simultaneously, the court had before it:

(1) appellant's signed petition to withdraw his guilty plea and go to trial;

(2) counsel's contention that appellant was not legally responsible under the test of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); United States v. Currens, 290 F.2d 751 (3 Cir. 1961); or the American Law Institute, Model Penal Code § 4.01 et seq. (Proposed Draft 1962); and

(3) counsel's contention that appellant was not competent when he made his guilty plea and was not presently competent to stand trial.

The resulting confusion puts into focus these significant remarks of Judge Barbieri:

"This is the reaction I have. My reaction is that counsel have either disqualified the plea they are trying to present or qualified their client mentally, one or the other." (S.R. 167).

If, in other words, appellant was competent enough to present a petition for the withdrawal of the guilty plea, then he must be competent to stand trial. The court ruled:

"Judge Alexander: We will make a decision on what is going on. The Court is going on with the case. That is what is going on! We are going to overrule your motions and give you exceptions. In the event that at any time this Court feels for its own information and for the information generally also of counsel that a psychiatrist should be called for the purpose of going into his ability, we will make such an order and have one appointed, and we will consult you about it." (S.R. 169).

Thus the petition for a psychiatric examination was denied. The third petition, for leave to hire an investigator, was granted. At this point the following colloquy took place:

"The Defendant: Wait a minute, wait a minute. I want to make a little statement before it starts here.

"Judge Alexander: You are represented by counsel.

"The Defendant: I am not represented by counsel because they are ineffective.

"Judge Alexander: We say that your counsel have been very effective this morning.

"The Defendant: You think they were very, very, effective. What did they do for my behalf? Name one thing.

"Judge Alexander: We cannot get in an argument with the defendant.

"The Defendant: Look, I come down here and I'm not guilty, and you say I'm guilty on four indictments, two conspiracy bills and first degree murder. Before this guy goes on the stand, you already tell me I'm guilty, and I'm telling you I'm not.

"Judge Alexander: Take a seat.

"The Defendant: I'm telling you for that record that these lawyers here no longer represent me. I know you judges don't railroad guys today because it's the space age and you space them.

"A Woman: Your Honor, can't I tell you he is a sick boy?

"The Defendant: Will you sit down.

"A Woman: He is sick.

"The Defendant: Will you sit the God damn hell down.

"Judge Alexander: Go ahead. Call your witness.

"A Woman: Get your hands off him.

"Judge Alexander: Mr. Phelan.

"The Defendant: I'll tell you I'm not on trial here. I got no lawyers and I'm not standing trial on no guilty pleas.

"A Woman: Mr. Sprague and Mr. Crumlish have done this. You can't fight them both. You can lock me up for life. I don't care.

"Judge Alexander: Officer over there, take care of Mrs. Phelan. Don't let anything happen to her. Walk her out of the room and give her what she wants and see that she is protected.

"Let's proceed.

"Mr. Levy; Can we have a recess to calm him down?

"Judge Alexander: No We will go right on."

(S.R. 173–175).

At that time the court, by virtue of some off-the-record arrangement between counsel, had examined most if not all of the psychological reports referred to hereinabove. (S.R. 158). While none of these reports might furnish a basis for finding appellant to be unresponsible under the M'Naghten Rules, taken together they certainly cast serious doubt on his competency to participate in the court proceedings on and after October 11, 1965.

It must be conceded that counsel's petition raising the question of appellant's competency was neither a model of draftsmanship nor, technically at least, addressed to the correct relief. The proper petition would have been for the appointment of a sanity commission under Section 344 of the Mental Health Act of 1951, P.L. 533, as amended, 50 P.S. § 1224.[3] See, *e. g.*, Commonwealth v. Moon, 383 Pa. 18, 117 A.2d 96 (1955). Nevertheless, throughout the proceedings counsel continued to press the contention that the appellant was not competent to go on with the trial. See, e. g., S.R. 251. Under the circumstances the court came under a serious obligation to consider that contention independently, especially where, as here, counsel were in the conflicting position of pressing that point against their client's wishes while at the same time attempting to advance an inconsistent position which he wanted advanced.

Throughout the proceedings up to this point the Commonwealth opposed both any continuance and any additional psychiatric examination. Undoubtedly the interest of Jack Lopinson's attorney in the proceedings (see, e. g., S.R. 182, 240) influenced the Commonwealth position.

The Commonwealth case went forward after appellant's outburst. It proved the corpus delicti, the recovery of the murder weapons from the Delaware Riv-

3. Sanity commissions are presently convened under provisions of the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4408.

er, ballistics tests connecting those weapons with the homicides, appellant's statement of July 28, 1964, his July 28, 1964, testimony on Lopinson's habeas corpus case, and his January 29, 1965, testimony at the Lopinson trial. The Commonwealth presented no psychiatric testimony. At the end of its case (S.R. 311) appellant's counsel renewed his objection to the entire proceeding on the ground of appellant's present incapacity to participate in the hearing. The court ruled:

> "Judge Alexander: We take the position as far as the psychiatrist to examine him for his competency, we overrule your motion and grant you an exception." (S.R. 313).

At that time there was pending in the Supreme Court of Pennsylvania the case of Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966), which presented the question whether Pennsylvania would abandon its adherence to the M'Naghten Rules for determining criminal responsibility in favor of a *Durham, Currens* or American Law Institute test. The Supreme Court continued to adhere to the M'Naghten Rules both in *Ahearn* and in the direct appeal in appellant's case. Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967). At the degree of guilt hearing, however, counsel vigorously contended for the right to offer psychiatric testimony in support of appellant's lack of responsibility under a rule of criminal responsibility other than M'Naghten. Counsel conceded that those psychiatrists who had examined appellant would not testify that appellant lacked criminal responsibility in the M'Naghten sense. Counsel made an offer of proof (S.R. 334) to introduce in evidence psychiatric testimony and psychiatric reports from all sources, Commonwealth and defense, to prove that appellant could not have formed the specific intent necessary for first degree murder, but stipulated (S.R. 337) that the offer was not for purposes of proving lack of responsibility in the M'Naghten sense. The court refused to hear any such testimony or to consider these reports on the degree of guilt, even on the issue of the premeditation required to elevate the murders from second to first degree (S.R. 337). The appellant was not put on the stand, no testimony was offered on his behalf, and the degree of guilt hearing concluded. (S. R. 340). Appellant was found guilty of first degree murder. (S.R. 343).

After this decision was announced the court proceeded to consider the penalty. (S.R. 344). The Commonwealth offered no testimony. The defense read into the record the contents of all the psychiatric reports to which it had referred in its unsuccessful offer of proof. (S.R. 345–406). Again appellant was not put on the stand, and no other witnesses, not even members of his family, were called. The court recessed for several days and reconvened on October 19, 1965, to announce the sentence. For the first time in the proceedings appellant was asked if he wanted to say anything, and he said:

> "The Defendant: Well, when I came down here at the start of these proceedings, I told you that I was not guilty, and you told me that I was. Then I said that I didn't want these lawyers here to represent me because I was getting what is known as a kangaroo court. Then by your order they had to stay here and try to represent me. Now I really don't know what has happened here. I asked these lawyers here to get me a trial by jury.
>
> Now beings as you told me that I got to stand on the guilty plea that I never even gave in the first place, before you even heard any prosecution at all, you already had your mind made up. Now, know what I mean?
>
> And then Sprague, he says that I am supposed to testify at Lopinson's trial. Right? But he didn't say that I was shanghaied out of Holmesburg at five o'clock in the morning and held in this City Hall until twelve o'clock at night. And he didn't say he went to the hospital and had my mother shanghaied out of the hospital if I don't do what he wants. And then they keep

me down here under this here threat. So I tell their lies at Lopinson's trial. So far as those statements I am supposed to have made, I never made them, they are not my statements.

Now I told you that at the beginning of this, and all along you tell me I'm guilty. So now if you say I'm guilty, I'm going to maintain my innocence for the record, and what you can do now is give me the chair and get me out of here." (S.R. 430–431).

The court then announced the imposition of the death sentence for each murder. (S.R. 432).

Counsel at no time abandoned the contention that appellant was presently incompetent. The court, prior to the conclusion of the degree of guilt hearing, had an off-the-record opportunity to examine the psychiatric reports. These eventually went into evidence on the issue of the sentence. The record makes it quite clear that throughout the case appellant was not cooperating with counsel, and in fact strenuously opposed the course they were pursuing. The psychiatric reports strongly suggest that appellant's paranoia made him so suspicious even of those who were assigned to help him, that he was unable by reason of mental disease to cooperate in his defense. The record demonstrates objectively a lack of cooperation consistent with such a condition. Despite all this no hearing was held before the imposition of the death sentence to determine his competency. Such a hearing was, in the circumstances disclosed in this record, a due process requirement. "While [appellant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." Pate v. Robinson, 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966). The Supreme Court of Pennsylvania dealt with the issue of appellant's competency as follows:

"Citing Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), it is argued that if a 'bona fide doubt'

existed as to Phelan's competency to stand trial, it was mandatory upon the court to order an independent determination of his sanity. The ruling in *Robinson* was based upon the requirements of a specific statute of the State of Illinois: Pate v. Robinson, supra, at 385, 86 S.Ct. 836. More importantly, the evidence in this record warrants no such doubt." Commonwealth v. Phelan, *supra* at 278, 234 A.2d at 548.

With all deference, the quoted language misconceives both the holding in Pate v. Robinson and the contents of the record in this case. Moreover, the Pennsylvania statute applicable to determination of competency at the time of appellant's plea and trial was quite similar, procedurally, to the Illinois statute referred to in Pate v. Robinson. Ill.Rev. Stat., c. 38, § 104–2 (1963); People v. Shrake, 25 Ill.2d 141, 182 N.E.2d 754 (1962). Mental Health Act of 1951, P.L. 533, as amended, 50 P.S. § 1224; Commonwealth ex rel. Mulligan v. Smith, 156 Pa.Super. 469, 40 A.2d 701, 703 (1945).

The district court held an evidentiary hearing on the habeas corpus petition filed on appellant's behalf by counsel. (Appellant refused to sign the petition). That hearing was held "to determine whether [appellant] was competent when he entered the plea of guilty and when he stood trial on the degree of guilt." 312 F.Supp. 350, 353 (E.D.Pa.1970). Obviously the district court concluded, as we do, that the state court record did not adequately resolve the doubt about appellant's competency. 28 U.S.C. § 2254(d) (1964); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In the evidentiary hearing appellant, over his counsel's objection, took the stand, insisted that he was competent but that his confessions, testimony, and guilty plea were all coerced, and that he had never authorized his original attorney to enter a guilty plea (H. 153–201). With this testimony in the record the district court ruled that appellant had waived the attorney-client privilege, and directed his original attorney, Mr. Walsh,

to testify. On the basis of Walsh's testimony (H. 216–232) as well as that of appellant, the district court concluded that appellant was at all times competent.[4]

The majority opinion, Part III, relies upon the finding of the district court that Phelan was competent to participate in the degree of guilt hearing. This reliance assumes that the district court properly held an evidentiary hearing. Such a hearing should have been held only if the state court record presented a question of competency and disclosed that there was no full, fair and adequate hearing on that question. 28 U.S.C. § 2254(d) (1964); Townsend v. Sain, *supra*. Thus it would seem to be common ground to the district court, the majority, and the dissent, that the state court record presented an unresolved question of competency. Yet the majority opinion, Part III, discusses at great length what it refers to as the obfuscation of defendant's position on the issue of competency. If the state court record presents, as it does, a clear and unresolved issue as to the appellant's competency, such obfuscation, and all the rest of the majority discussion of the state court record in support of its conclusion is simply irrelevant. An incompetent person by definition is incapable of taking a position or making a waiver. Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966); Taylor v. United States, 282 F.2d 16, 23 (8 Cir. 1960). Reliance on appellant's obfuscation and confusion of the state court proceedings in support of a conclusion that he was competent to take a position is inconsistent with the majority's apparent agreement that a habeas corpus evidentiary hearing was required.

Moreover the reference to the confusion caused by defense counsel simultaneously advancing a present competency contention, a criminal responsibility contention, and the contentions which appellant wanted advanced is hardly fair. That confusion was engendered by the repeated refusal of the state court to consider separately the issue of competency. Counsel were from dire necessity put in the position of advancing inconsistent positions. I dispute "the conclusion that Phelan and his counsel were embarked upon a course of action aimed at withdrawal of the guilty pleas, and would not have been content with an examination for any other purpose than to determine competency at the time of the arraignment."[5] The specific references to the record set forth hereinabove must be excised before such a conclusion may be drawn.

Thus the case turns on the finding by the district court that appellant was competent to participate in the degree of guilt hearing. 312 F.Supp. at 358. The majority sustains that finding because "there is credible expert and lay testimony in the record to support the finding * * * that Phelan was competent at these critical times [and] such finding is not clearly erroneous * * *" That testimony must, I submit, be analyzed more critically than in Part III of the majority opinion.

First, there was appellant's own testimony. He took the stand over his counsel's objection, because to this day he disputes their strongly held belief that he is incompetent. He testified that he wanted only to withdraw his guilty plea and obtain a jury trial. He criticised his original attorney, Mr. Walsh. Because of that criticism the district court reversed an earlier ruling recognizing the attorney-client privilege, and permitted Mr. Walsh to make extensive disclosures of information received from appellant in confidence. 312 F.Supp. at 354 n. 8.

4. Mr. Carroll, Mr. Walsh's associate, also testified (H. 249–250):

"Q. What impression did you get of his mental condition at the conclusion of this statement he had given you?

* * * * *

A. I thought that he was hopelessly insane."

5. Phelan, of course, never wanted any competency hearing. If he was incompetent his wishes were irrelevant.

That testimony would not have been admissible unless appellant was competent to open the door by criticising Mr. Walsh. *See* Rules of Evidence for the United States District Courts and Magistrates rule 5-03(d) (3) and authorities cited *in note* (3) p. 84 (*Preliminary Draft* 1969); ABA Code of Professional Responsibility, Canon 4, Disciplinary Rule 4-101(c) (4) (1969). He was found to be competent to open the door principally on the basis of Mr. Walsh's testimony. This rather circular ruling is surprising to me. But assuming its correctness, as the majority apparently does, and assuming further that a habeas corpus evidentiary hearing on competency at a prior time is permitted by Pate v. Robinson, I would hold that the district court finding, based as it is chiefly on the testimony of Mr. Walsh, was clearly erroneous for these reasons:

1. Mr. Walsh had no opportunity to observe the appellant during the critical time when present counsel were attempting to prepare for and participate in the degree of guilt hearing. He had on July 26, 1965 advised the state court that a month previously his relationship with appellant had deteriorated to the extent that he could not give effective representation. (S.R. 12). Thus from at least the end of June he was out of contact with appellant. The degree of guilt hearing took place in October.

2. The district court does not disclose any reason for finding Mr. Walsh's lay opinion credible while finding the lay opinion of Mr. Carroll, Walsh's associate counsel "I thought he was hopelessly insane" apparently not credible. (H. 249-250). Both had substantially the same opportunity to observe appellant prior to the time Mr. Walsh was relieved as counsel and there is no finding that Mr. Carroll was a less qualified lay observer than Mr. Walsh. In fact the district court's heavy reliance upon Mr. Walsh's lay testimony was highly improper. Cf. Carroll v. Beto, 421 F.2d 1065, 1068 (5 Cir. 1970).

3. Mr. Walsh had in his file two reports of psychiatric examinations both of which indicated paranoid schizophrenia. (S.R. 353-355, 363-365). This diagnosis was entirely consistent with the mistrust of counsel which Mr. Walsh reported to the state court and to the district court.

4. The observation of appellant by the district court at the habeas corpus hearing was no competent indication of his condition at the degree of guilt hearing almost four years earlier. Carroll v. Beto, *supra.*

5. The only psychiatric testimony presented in the district court on behalf of the Commonwealth was that of Dr. Baldwin Keyes, whose examination of appellant took place over a year before the degree of guilt hearing and for the purpose of determining criminal responsibility under the M'Naghten Rules, not for the purpose of determining competency. (S.R. 382). Psychiatric examinations are not fungible without regard to purpose. Rhay v. White, 385 F.2d 883, 886 (9 Cir. 1967). Dr. Keyes' examination was not even at a relevant time.

But my position is that we need not and should not consider whether the district court finding was clearly erroneous, since in the circumstances presented by the state court record no evidentiary hearing should have been held. Pate v. Robinson, *supra.*

A good place to begin a discussion of the effort by the majority to distinguish Pate v. Robinson is the testimony of Dr. Appel in the habeas corpus hearing. He had examined appellant in December of 1964, and he testified that appellant was in his opinion incompetent at the time of his arraignment in October of 1964. (H. 83-96). He testified, further, that he could not give an opinion with reasonable

medical certainty as to appellant's condition on the date of the degree of guilt hearing in October of 1965. (H. 86–89). That caution and candor on Dr. Appel's part illuminates the reason for the underlying premise of Pate v. Robinson that a determination of competency depends upon concurrent observation. Writing for the majority Justice Clark wrote:

"It has been pressed upon us that it would be sufficient for the state court to hold a limited hearing as to Robinson's mental competence at the time he was tried in 1959. If he were found competent, the judgment against him would stand. But we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial. Dusky v. United States, 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960). The jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. That Robinson's hearing would be held six years after the fact aggravates these difficulties."

The court ordered a new trial, and said:

"If the State elects to retry Robinson, it will of course be open to him to raise the question of his competence to stand trial at the time and to request a special hearing thereon. In the event sufficient doubt exists as to his present competence such a hearing must be held. If found competent to stand trial, Robinson would have the usual defenses available to an accused." 383 U.S. at 387, 86 S.Ct. at 843.

Justice Harlan, who disagreed with the Court's conclusion in Pate v. Robinson that the state court record raised a substantial issue of competency, wrote:

"The Court appears to hold that a defendant's present incompetence may become sufficiently manifest during a trial that it denies him due process for the trial court to fail to conduct a hearing on that question on its own initiative. I do not dissent from this very general proposition, and I agree also that such an error is not 'waived' by failure to raise it and that it may entitle the defendant to a new trial without further proof. Waiver is not an apposite concept where we premise a defendant so deranged that he cannot oversee his lawyers. Since our further premise is that the trial judge should and could have avoided the error, a new trial seems not too drastic an exaction in view of the proof problems arising after a significant lapse of time." 383 U.S. at 388, 86 S.Ct. at 843 (footnote omitted).

Thus the Supreme Court was unanimously of the view that if a substantial issue of competency appears in the state court record (and on that apparently we all agree in this case) the remedy is a new trial, not an untimely retrospective determination of competency. Just as in *Robinson* a retroactive determination of competency in a state court proceeding was no due process equivalent to a pretrial determination of competencey in the face of substantial doubt, so also a retrospective determination of competency in the habeas corpus case is no such equivalent. Where, as here, the state court record presents (1) evidence which raises substantial doubt as to a petitioner's competency to participate in judicial proceedings, and (2) the absence of an evidentiary hearing on that issue, the appropriate remedy is to order that those proceedings be held anew, not to hold a retrospective hearing on competence. Rhay v. White, *supra;* Hansford v. United States, 124 U.S.App.D.C. 387, 365 F.2d 920, 925 (1966). *But see* Lee v. Alabama, 386 F.2d 97 (5 Cir. 1967).

The doubt as to appellant's competency in my judgment tainted the entire proceedings on October 11, 1965 and thereafter. These proceedings included both the hearing on appellant's motion to withdraw his guilty plea and the degree of guilt and penalty hearing.

I would reverse the order denying the petition for habeas corpus and remand the case to the district court with directions to issue a writ of habeas corpus

unless the Commonwealth would within a reasonable time (1) afford to appellant an appropriate hearing as to his present competency to participate in judicial proceedings and, if appellant were found competent at such a hearing (2) hold a new hearing on appellant's motion to withdraw his guilty plea and, if that motion were denied, (3) hold a new degree of guilt and penalty hearing.

SEITZ, Chief Judge (dissenting).

I would reverse the judgment of the district court and order it to grant the writ unless the state promptly offers appellant a retrospective hearing as to his competency.

Distilled to its essence this case, in my view, presents two questions:

1. Did the evidence and circumstances at the hearing (a) to withdraw the guilty plea and (b) to determine the degree of guilt, raise such a bona fide doubt as to petitioner-appellant's competency to participate at the time that it was error of constitutional proportions not to hold an independent hearing on that issue?

2. If there was such error, was the retrospective hearing on that issue in the district court a sufficient compliance with the due process mandate of Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)?

The answer to the first question posed is obtained by an examination of the record before the state court in 1965. It would serve no purpose to add to the reader's burden by repeating what is extracted in the other opinions with respect to the competency issue. Suffice it to say that I believe the several psychiatric reports, without more, created a bona fide doubt as to appellant's competency. Rather than justifying a refusal to hold such a hearing, they cried out for an independent hearing and determination of competency. This obligation was not diluted by the somewhat confusing position taken by appellant's counsel.

Having found that the state court had an obligation to direct a hearing on the competency issue, I turn to the issue as to whether the district court hearing and determination fulfills the due process requirements of Pate v. Robinson.

An important preliminary question arises. Could the district court hearing fulfill the constitutional requirement of an independent hearing as to competency when a state criminal case is involved? I think not. I think the determination was for the state court. I say this because the state is free to decide pursuant to its own procedures whether a criminal defendant is competent to participate in any given stage of a proceeding. See, e. g., Commonwealth v. Gossard, 385 Pa. 312, 123 A.2d 258 (1956). In contrast the federal court's function is limited to deciding whether there existed a bona fide doubt as to the defendant's competency within the context of Pate v. Robinson, *supra.*

I conclude that had the district court decided, as I think it should have, that there was a bona fide doubt as to appellant's competency at the time of the state court hearing, it should have issued the writ but stayed its execution on the condition that the state afford appellant appropriate relief within a reasonable time. See Barefield v. State of New Mexico, 434 F.2d 307 (10th Cir. 1970).

The next major issue is what constitutes "appropriate relief" in these circumstances. The answer is extremely difficult because it calls for an application of the teachings of Pate v. Robinson to a quite disparate factual situation.

The court in Pate v. Robinson noted the difficulty in retrospectively determining an accused's competence to stand trial. It noted that "[t]he jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record." The court went on to say that the "need for concurrent determination" distinguished the case from Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908 (1964). In Pate v. Robinson there was an absence of contemporaneous

medical evidence on the competency issue. Here there is substantial psychiatric evidence as to the appellant's competency which is relatively contemporaneous to the period here deemed crucial. Conner v. Wingo, 429 F.2d 630, 637 (6th Cir. 1970). Presumably these psychiatrists are available to testify based on extremely relevant examinations and reports. The fact that some of the reports focused on the McNaughten issue does not alter their possible relevancy on the issue of competency in 1965.

In Pate v. Robinson the court concluded that under the facts before it there could not be a "meaningful" hearing solely on the issue of competency to stand trial. Here, in contrast, the requisites for a meaningful hearing are present.

I therefore conclude on the present facts that it is constitutionally permissible for the issue of the appellant's competency at the crucial date to be resolved by a retrospective determination. Of course, his present competency is always a possible threshold issue. *See* 383 U.S. at 387, 86 S.Ct. 836.

HASTIE, Circuit Judge (dissenting).

I join in Judge Gibbons' dissenting opinion and add only a brief statement summarizing the decisive considerations as they appear to me.

The state record makes it at least doubtful whether Phelan was mentally competent to defend himself at the time of the hearing on the degree of his guilt. Upon this conclusion, all members of the court seem to agree. However, the state court did not permit an inquiry into that critical and questionable matter at the hearing. Probably this is attributable to the rather confused course of the hearing. On that occasion, defense counsel were advancing various contentions about sanity at the time of the crime and competency to defend at various stages of the criminal proceeding. At the same time, Phelan's frequent wild outbursts and his interruptions and contradictions of his own lawyers made it all but impossible to conduct the hearing in an orderly and discerning manner with each issue clearly identified and decided. Yet, as Judge Gibbons points out, the record shows that defense counsel did attempt, unsuccessfully, to have Phelan's competency to participate in that hearing investigated and determined.

Now, long after the event, the only practical remedy for the above summarized inadequacy in trial procedure is a requirement that the state convene a new hearing on the degree of guilt, with the defense then accorded an opportunity to raise and contest as a preliminary question the issue of Phelan's competency to defend himself at that new hearing.

**UNITED STATES of America,**
**Appellee,**

v.

**Raymond BROWN and Steven Liley,**
**Appellants.**

**No. 71–1105.**

United States Court of Appeals,
Eighth Circuit.

Nov. 30, 1971.

Certiorari Denied March 6, 1972.
See 92 S.Ct. 1205.

